1 | ROBERT C. SCHUBERT S.B.N. 62684
JUDEN JUSTICE REED S.B.N. 153748
2 | AARON H. DARSKY S.B.N. 212229
SCHUBERT & REED LLP
3 | Two Embarcadero Center, Suite 1660
San Francisco, California 94111
4 | Telephone: (415) 788-4220
Facsimile: (415) 788-0161
5 |
DOUGLAS M. BROOKS
6 | EDWARD L. MANCHUR
GILMAN AND PASTOR, LLP
7 | 999 Broadway, Suite 500
Saugus, MA 01906
8 | Telephone: (781) 231-7850
Facsimile: (781) 231-7840
9 |
Attorneys for the Representative Plaintiffs
10 | Nancy Jacobs and Annette M. Sanchez,
Individually and on behalf of all others
11 | similarly situated; and on behalf of the
general public

**BY FAX**

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

12

13 | **UNITED STATES DISTRICT COURT**

14 | **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

15 | **LOS ANGELES DIVISION**

16 | NANCY JACOBS and ANNETTE M,
SANCHEZ Individually On Behalf Of
17 | Themselves And All Others Similarly
Situated, and on Behalf of the General Public,

18 | Plaintiffs,

19 |

20 | vs.

21 | HERBALIFE INTERNATIONAL, INC.,
HERBALIFE INTERNATIONAL OF
AMERICA, INC., DREAM BUILDERS &
22 | ASSOCIATES INTERNATIONAL, INC.,
H.B. INTERNATIONAL GROUP, INC.,
23 | ANTHONY POWELL, DORAN ANDRY,
CRAIG M. TSUTAKAWA, CAROLINE
24 | TSUTAKAWA, TARUN JUNEJA, JOHN
BEALL, BRETT BARTHOLOMEW, LEAH
25 | SINGLETON, STEPHEN COMBS and
DEBERA COMBS,

26 | Defendants.

27

28

**Case No. CV-02-1431 PA (RCx)**

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

ENTER ON ICMS

JAN 3 - 2003

Page 1

Filed By
Fax & File

1    Individual and Representative Plaintiffs, Nancy Jacobs and Annette M.

2    Sanchez, on behalf of themselves and all others similarly situated, allege as follows:

## I. JURISDICTION AND VENUE

5    1.    Plaintiffs bring this action pursuant to the Racketeer Influenced and

6    Corrupt Organizations ("RICO") sections of Title IX of the Organized Crime Control

7    Act of 1970 [18 U.S.C. §§1961-1968], as well as the statutory and common law of the

8    State of California.

9    2.    This Court has jurisdiction of this action pursuant to 28 U.S.C. §1331

10   (federal question), 28 U.S.C. §1337 (regulation of commerce), 18 U.S.C. §1964(a)

11   and (c) (RICO), and the principles of supplemental jurisdiction, 28 U.S.C. §1367.

12   3.    Venue is proper in this District pursuant to 18 U.S.C. §1965 and 28

13   U.S.C. §1391(b).  Many of the acts charged herein occurred in this District, defendant

14   Herbalife International of America, Inc. is organized under the laws of the State of

15   California, and defendants Herbalife International, Inc., Herbalife International of

16   America, Inc. and H.B. International Group, Inc. each maintains its principal offices

17   in this District.

18   4.    In connection with the acts and conduct alleged in this Class Action

19   Complaint ("Complaint"), the Defendants, and each of them, directly or indirectly,

20   utilized the mail, the wires, and the instrumentalities of interstate commerce in

21   carrying out the pyramid scheme and unlawful and fraudulent trade practices which

22   are the subject of this action.

## II. PARTIES

25   5.    At all times relevant:

26   a.    Plaintiff Nancy Jacobs ("Jacobs") was a resident of Wheaton,

27   Illinois and lost more than $13,000.00 in the Defendants' fraudulent business

28   opportunity scheme.

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 2

b.     Plaintiff Annette M. Sanchez ("Sanchez") was a resident of Roseville, California and invested and lost more than $20,000.00 in the Defendants' fraudulent business opportunity scheme.

c.     Plaintiffs bring this action in their individual and representative capacities on behalf of the Plaintiff Class of United States Herbalife Supervisors who are or have been members of a Lead Generation System known as "The Newest Way to Wealth" ("NWTW"), the d/b/a of defendant Dream Builders & Associates International, Inc.

6.     At all times herein relevant:

a.     Defendant Herbalife International, Inc. was a corporation organized and existing under the laws of the State of Nevada having its principal place of business at 1800 Century Park East, Los Angeles, California 90067.

b.     Defendant Herbalife International of America, Inc. was a corporation organized and existing under the laws of the State of California, having its principal place of business at 1800 Century Park East, Los Angeles, California 90067. Herbalife International of America, Inc. has common and/or overlapping management with and is owned and controlled by Herbalife International, Inc.  Defendants Herbalife International, Inc. and Herbalife International of America, Inc. are collectively referred to herein as "Herbalife" or the "Herbalife Defendants" except where the context indicates otherwise.

c.     Defendant Dream Builders & Associates International, Inc. ("Dream Builders") was a corporation organized and existing under the laws of the State of Nevada, having its principal place of business at 1004 Central Avenue South Kent, Washington 98032-6103.

d.     Defendant H.B. International Group, Inc. was a corporation organized and existing under the laws of the State of Nevada, having its principal place of business at 1241 E. Dyer Road #110, Santa Anna, California 92705-5750.

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1          e.          Defendant Anthony Powell ("Powell") was an executive officer
2    and/or director of Dream Builders and was actively engaged in business in this
3    District on behalf of Herbalife and Dream Builders and committed the wrongs alleged
4    herein in this District and throughout the United States. Powell also has the ability to
5    and does in fact, conduct or participate in the affairs of Herbalife and Dream Builders.
6    In 2001 Powell achieved the rank of "President's Team" in the Herbalife Sales and
7    Marketing Plan. Powell, along with other of the Defendants, conceived, authorized
8    the use of and operated the Lead Generation System known as "The Newest Way to
9    Wealth" ("NWTW" or the "NWTW System"), the fraudulent business opportunity
10   marketing scheme complained of herein, made the misrepresentations alleged herein,
11   and drafted and/or adopted the fraudulent NWTW promotional materials discussed
12   below.

13         f.          Defendant Doran Andry ("Andry") is one of Herbalife's top
14   distributors, a member of Herbalife's Chairman's Club, the highest level in the
15   Herbalife Sales and Marketing Plan. Andry represents that he earns $500,000 per
16   month from his Herbalife business. Andry is president, chief executive officer and/or
17   director of Defendant H.B. International Group, Inc., and a close associate of
18   Defendant Powell. Andry and Defendant Powell were actively involved in the
19   conception, formation and operation of the NWTW System as alleged herein. As a
20   member of Herbalife's Chairman's Club, Andry met regularly with the officers and
21   directors of Herbalife to set Herbalife's policies, procedures and regulations
22   governing all distributor representations and solicitations. Andry has the ability to
23   and does in fact, conduct or participate in the affairs of Herbalife, H.B. International
24   Group, Inc. and Dream Builders. Andry authorized the use of the NWTW System,
25   the fraudulent business opportunity complained of herein, made the
26   misrepresentations alleged herein, and drafted and/or adopted the fraudulent NWTW
27   promotional materials discussed below.

28

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 4

1           g.    Defendant Craig M. Tsutakawa ("C.M. Tsutakawa") is one of

2  Herbalife's top distributors, and achieved the rank of Presidents Team in November

3  of 1999.  C.M. Tsutakawa has the ability to and does in fact, conduct or participate in

4  the affairs of Defendants Dream Builders, H.B. International Group, Inc. and

5  Herbalife.  C.M. Tsutakawa was a close associate of Defendant Powell and was

6  actively involved in the conception, formation and/or operation of the NWTW

7  System,  authorized the use of the NWTW System, the fraudulent business

8  opportunity complained of herein, made the misrepresentations alleged herein, and

9  drafted and/or adopted the fraudulent NWTW promotional materials discussed below.

10           h.    Defendant Caroline Tsutakawa ("Tsutakawa") is one of

11  Herbalife's top distributors, and achieved the rank of Presidents Team in November

12  of 1999.  Tsutakawa has the ability to and does in fact, conduct or participate in the

13  affairs of Defendants Dream Builders, H.B. International Group, Inc. and Herbalife.

14  Tsutakawa was a close associate of Defendant Powell and was actively involved in

15  the conception, formation and/or operation of the NWTW System, authorized the use

16  of the NWTW System, the fraudulent business opportunity complained of herein,

17  made the misrepresentations alleged herein, and drafted and/or adopted the fraudulent

18  NWTW promotional materials discussed below.

19           i.    Defendant Tarun Juneja ("Juneja") is one of Herbalife's President's

20  Team distributors, an executive officer and/or director of Dream Builders and a close

21  associate of Defendants Powell and Andry.  Juneja was actively involved in the

22  conception, formation and/or operation of the NWTW System as alleged herein.

23  Juneja has the ability to and does in fact, conduct or participate in the affairs of Dream

24  Builders and Herbalife.   Juneja authorized the use of the NWTW System, the

25  fraudulent business opportunity complained of herein, made the misrepresentations

26  alleged herein, and drafted and/or adopted the fraudulent NWTW promotional

27  materials discussed below.

28

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 5

1           j.    Defendant John Beall ("Beall") is one of Herbalife's top

2 distributors, an executive officer and/or director of Dream Builders and a close

3 associate of Defendant Powell. Beall was actively involved in the conception,

4 formation and/or operation of the NWTW System as alleged herein. Beall has the

5 ability to and does in fact, conduct or participate in the affairs of Dream Builders and

6 Herbalife. Beall authorized the use of the NWTW System, the fraudulent business

7 opportunity complained of herein, made the misrepresentations alleged herein, and

8 drafted and/or adopted the fraudulent NWTW promotional materials discussed below.

9           k.    Defendant Brett Bartholomew ("Bartholomew") is one of

10 Herbalife's top distributors, an executive officer and/or director of Dream Builders

11 and a close associate of Defendant Powell. Bartholomew was actively involved in the

12 conception, formation and/ or operation of the NWTW System as alleged herein.

13 Bartholomew has the ability to and does in fact, conduct or participate in the affairs of

14 Dream Builders and Herbalife. Bartholomew authorized the use of the NWTW

15 System, the fraudulent business opportunity complained of herein, made the

16 misrepresentations alleged herein, and drafted and/or adopted the fraudulent NWTW

17 promotional materials discussed below.

18           l.    Defendant Leah Singleton ("Singleton"), formerly sued herein as

19 Leah Graham, is one of Herbalife's top distributors, an executive officer and/or

20 director of Dream Builders and a close associate of Defendant Powell. Singleton was

21 actively involved in the conception, formation and/or operation of the NWTW System

22 as alleged herein. Singleton has the ability to and does in fact, conduct or participate

23 in the affairs of Dream Builders. Singleton authorized the use of the NWTW System,

24 the fraudulent business opportunity complained of herein, and made the

25 misrepresentations alleged herein, and drafted and/or adopted the fraudulent NWTW

26 promotional materials discussed below.

27           m.    Defendant Steven Combs ("S. Combs") is one of Herbalife's

28 President's Team distributors, and a close associate of Defendant Powell. S. Combs

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 6

1  was actively involved in the conception, formation and/or operation of the NWTW

2  System as alleged herein. S. Combs has the ability to and does in fact, conduct or

3  participate in the affairs of Dream Builders and Herbalife. S. Combs authorized the

4  use of the NWTW System, the fraudulent business opportunity complained of herein,

5  made the misrepresentations alleged herein, and drafted and/or adopted the fraudulent

6  NWTW promotional materials discussed below.

7          n.      Defendant Debera Combs ("D. Combs") is one of Herbalife's

8  President's Team distributors, and a close associate of Defendant Powell. D. Combs

9  was actively involved in the conception, formation and/or operation of the NWTW

10  System as alleged herein. D. Combs has the ability to and does in fact, conduct or

11  participate in the affairs of Dream Builders and Herbalife. D. Combs authorized the

12  use of the NWTW System, the fraudulent business opportunity complained of herein,

13  made the misrepresentations alleged herein, and drafted and/or adopted the fraudulent

14  NWTW promotional materials discussed below.

15          7.      Defendants Powell, Andry, C.M. Tsutakawa, Tsutakawa, Juneja, Beall,

16  Bartholomew, Singleton, S. Combs and D. Combs are sometimes collectively referred

17  to herein as the "Individual Defendants."

18

19

20  ## III. FACTS COMMON TO ALL CAUSES OF ACTION

21  ### A. Background of Herbalife

22          8.      Herbalife began operations in 1980. Herbalife is a multi-level or

23  "network" marketing company that sells a wide variety of weight management

24  products, nutritional supplements and personal care products throughout the United

25  States and in approximately 50 countries. Defendant Herbalife International, Inc.

26  does business in its own behalf and through 47 domestic and foreign subsidiaries,

27  including Defendant Herbalife International of America, Inc. Herbalife International,

28  Inc.'s Form 10-K Annual Report for the year 2000 (the "year 2000 10-K") reported

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 7

1 | retail sales for that year in the amount of $1.764 billion, and net income for that year
2 | of $36,919,000.

3     9.     The year 2000 10-K represents that Herbalife markets 179 products
4 | under various trade names, including "thermojetics." That document also discloses
5 | that Herbalife creates and sells to distributors various marketing materials purportedly
6 | to assist Herbalife distributors in marketing Herbalife products and recruiting new
7 | Herbalife distributors. These marketing materials include written educational and
8 | promotional documents, videotapes, audio cassette recordings and so-called
9 | "distributor kits," the purchase of which is a prerequisite to obtaining an Herbalife
10 | distributorship.

11     10.     The year 2000 10-K represents that Herbalife's products are distributed
12 | exclusively through a "network marketing system" consisting of over one million
13 | distributors.

14     11.     The Herbalife network marketing system is jointly managed by
15 | Herbalife's executive officers and a select group of distributors at the President's
16 | Team level. Herbalife's senior distributors, including the Individual Defendants, are
17 | deeply and intimately involved in its sales, training, motivation and strategic planning
18 | efforts.

19     12.     The management role of Herbalife's high level distributors is emphasized
20 | in Herbalife's publicly filed documents. For instance, Herbalife's February 5, 1997
21 | Form S-3 (the "1997 Prospectus") states that "Mark Hughes and the Company's top
22 | distributors ... are committed to training and motivating Herbalife's distributors." The
23 | 1997 Prospectus reported that Herbalife's "most senior distributors consist of
24 | approximately 260 distributors (as of December 31, 1996) who comprise the
25 | President's Team and who work closely with Mark Hughes to develop and implement
26 | new initiatives and strategies for increasing sales and distributor productivity
27 | throughout the Company's entire distributor organization."

28 |

Page 8

13.     This joint management of Herbalife's network marketing system continued throughout the Class Period, including after the death of Mr. Hughes. For instance, Herbalife's December 31, 2001 Form 10-K states that "[m]embers of the President's Team work closely with us to develop and implement new initiatives and strategies for increasing sales and distributor productivity throughout our entire distributor organization." Herbalife acknowledges that "some key supervisors who have attained the highest levels within our distributor network are responsible for generating a substantial portion of our sales and for recruiting a substantial number of our distributors."

## B. The Herbalife Sales and Marketing Plan

14.     Herbalife pays its distributors pursuant to the "Herbalife Sales and Marketing Plan" (the Herbalife Plan"). The entry level in the Herbalife Plan is the distributor level. To become a distributor, a person must be "sponsored" by an existing distributor, and must purchase a "distributor kit." Distributors are entitled only to purchase and sell Herbalife products. A distributor who wishes to sponsor other distributors and earn royalties and bonuses on the purchases of those distributors must become a "Supervisor." In order to qualify as a Supervisor, the distributors must purchase, from Herbalife or another distributor, Herbalife products representing 4,000 volume points in one month, or 2,500 volume points in two consecutive months. One "volume point" is equivalent to $1 (U.S.) at Herbalife's suggested retail prices. A Supervisor must re-qualify once each year (by again purchasing 4,000 volume points in one month or 2,500 volume points in two consecutive months) in order to keep their "Supervisor" status and continue receiving royalties and bonuses.

15.     Supervisors who maintain their purchase requirements are paid "royalty overrides" and various production bonuses on purchases of Herbalife products by their "downline organizations." By meeting various volume and recruitment targets, Supervisors can ascend in the Herbalife hierarchy from "World Team," "Global Expansion Team," "Millionaire Team" and "President's Team." The President's

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 9

1   Team includes an additional five levels, the highest being the "Chairman's Club," the
2   requirements for which include having at least five recruits who meet the volume
3   requirements for the President's Team. Distributors who reach the higher levels of
4   the Herbalife Plan and recruit large downline organizations can earn royalties and
5   bonuses far in excess of any retail profits they might earn in selling Herbalife products
6   to consumers. However, the number of distributors who reach the higher levels is
7   quite small. For example, in 1997 there were only 260 Herbalife President's Team
8   distributors out of a total of 115,000 Supervisors. In 1998 there were 397 President's
9   Team distributors out of a total of 139,000 Supervisors.

10      16.     The compensation structures of multi-level marketing companies like
11   Herbalife lend themselves readily to the opportunity for abuse, to the extent that
12   distributors are incentivized to focus their attention heavily on recruiting new
13   distributors rather than on making retail sales of products. Such abuses include
14   encouraging distributors to purchase more products than they can feasibly sell to bona
15   fide retail customers in order to meet volume requirements (a practice known as
16   "inventory loading") and making deceptive earnings claims. A multi-level sales
17   organization in which the members obtain monetary benefits primarily from the
18   recruitment of new members rather than selling goods to bona fide consumers is a
19   pyramid scheme. Pyramid schemes are inherently deceptive because most
20   participants are doomed to failure.

21      17.     Herbalife's compensation structure, as set forth in the Herbalife Plan, is
22   readily subject to these abuses. The potential payout for distributors who sponsor
23   large downline organizations far exceeds the "retail profits" a distributor could
24   feasibly earn by simply retailing Herbalife products. Accordingly, if not properly
25   monitored and policed, the Herbalife Plan would encourage distributors to spend most
26   of their time and energy in the recruitment of new distributors as opposed to the retail
27   sale of Herbalife products to consumers, which would result in the Herbalife Plan
28   constituting a pyramid scheme.

Page 10

18.     In order to avoid being characterized as a pyramid scheme, Herbalife has purported to adopt rules which require most of a distributor's product purchases to be retailed to consumers.  Among other things, these rules require distributors to certify that they have sold at least 70% of their prior product purchases before making a new order and that they have made retail sales to at least ten customers per month.

19.     The executive officers and directors of Herbalife have, and had at all times relevant hereto, the obligation to monitor the promotional methods of its distributors to insure that Herbalife distributors were not engaged in activities that would foster and/or virtually insure the occurrence of the abuses described above.  Further, Herbalife's executive officers and directors at all times relevant hereto were obligated to sanction and/or immediately terminate the Herbalife distributorship of any Herbalife distributor who conceived and formed marketing and promotional strategies that fostered the abuses described above.

20.     There have been previous instances where Herbalife distributors committed abuses of the Herbalife Sales and Marketing Plan.  For instance, on March 6, 1985, the California Attorney General filed a civil lawsuit against Herbalife, alleging inter alia that Herbalife's Sales and Marketing Plan violated the California Endless Chain Scheme law.  Herbalife attributed the marketing plan allegations to "over enthusiastic" distributors, but ultimately paid penalties of $850,000 and agreed to develop a compliance department to monitor the activities of its distributors.

### C.  Background of Herbalife's Lead Generation Systems

21.     Beginning in the late 1980's Herbalife began aggressively expanding overseas.  Herbalife's sales trend in new markets has been characterized by an initial period of rapid growth, as new distributors are recruited, followed by a decline in sales.  In its public filings Herbalife explains these sales declines as due to adverse publicity and increased regulatory scrutiny and other factors.  In fact, the pattern of initial rapid sales growth followed by sales decline accompanied by adverse publicity and increased regulatory scrutiny is a fundamental characteristic of pyramid schemes.

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 11

1  The opening of a new market results in an initial wave of recruitment as new
2  distributors get caught up in the excitement of potentially earning large amounts of
3  royalties and bonuses. Most of these distributors are inevitably disappointed when the
4  huge financial returns fail to materialize. By continuously opening new markets,
5  however, Herbalife was able to keep a sufficient number of Supervisors sufficiently
6  incentivized to keep sales increasing.

7     22.   Herbalife asserted that this continuous opening of new markets was an
8  essential component of its business strategy. Following this strategy, from 1992
9  through 1996 Herbalife commenced operations in twenty-three (23) new countries.

10     23.   Herbalife's expansion strategy worked until approximately 1995, in that
11  while some markets declined after an initial period of explosive growth, these
12  declines were more than offset by sales increases in new markets, such that
13  Herbalife's total sales increased substantially every year. In addition, as Herbalife
14  expanded into new markets through 1995, its United States sales continued to
15  increase, such that the percentage of Herbalife's United States sales as compared to
16  total worldwide sales remained relatively constant, about 33% to 36%. However, in
17  1996 Herbalife's United States sales experienced a dramatic drop, both in absolute
18  terms and as a percentage of worldwide sales. Herbalife's United States sales
19  declined from $333.6 million in 1995 (36.1% of worldwide sales) to $279.6 million in
20  1996 (23.3% of worldwide sales).

21     24.   As stated in its February 5, 1997 Form S-3 and its March 30, 1999 Form
22  10-K, in 1996 Herbalife determined that it needed to develop new initiatives to
23  enhance sales in the U.S. market and other markets that had followed the trend of
24  initial rapid growth followed by sales declines. Such "sales revitalization" initiatives
25  were to include extensive training and motivational programs and the creation of new
26  "regional planning and strategy groups that include senior distributors."

27     25.   One of Herbalife's new initiatives was to encourage and facilitate the
28  development by senior distributors of "Lead Generation Systems." The term "Lead

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 12

1  Generation Systems" is used within Herbalife to refer to distributor-developed
2  promotional systems, the use of mass mailings, telephone solicitations, sign-posting,
3  sales scripts and other techniques designed to increase recruitment of new distributors.

4    26.    One of the largest and most prominent Lead Generation Systems in
5  Herbalife was the "Newest Way to Wealth" program.

6    27.    Lead Generation Systems were ostensibly intended, as stated by
7  Herbalife's current CEO, Francis X. Tirelli, in a letter to President's Team
8  distributors, to take advantage of "21st Century communications vehicles" such as the
9  internet and computerized mailing and telephone systems. In fact, the use of Lead
10  Generation Systems was consciously intended by Herbalife and its senior distributors
11  (a) to permit senior distributors to use more aggressive promotional materials and
12  methods than those previously utilized and approved by Herbalife, (b) to provide
13  Herbalife with a plausible defense (i.e., the "over zealous distributor" defense) in the
14  event of regulatory problems with the distributor-generated promotional materials,
15  and (c) to enable senior distributors to supplement their income through the sale of
16  promotional materials to their downlines, and thereby provide an additional incentive
17  for senior distributors to remain with Herbalife.

18    28.    In effect, Herbalife unleashed its senior distributors and expressly and
19  tacitly directed and encouraged them to use deceptive and coercive techniques to
20  recruit new distributors. Herbalife tacitly agreed to refrain from enforcing its rules
21  against using deceptive earnings claims and other misrepresentations to recruit new
22  distributors, and to refrain from enforcing its rules designed to ensure that at least
23  70% of product purchases by Supervisors be actually retailed to consumers.
24  Moreover, at least in the case of the Newest Way to Wealth LGS, Herbalife
25  participated in the conduct of the LGS through its ongoing consultations with the top
26  distributors involved with NWTW, by giving prominent roles to the founders and
27  leaders of NWTW (for example, by recognizing Anthony Powell at the May, 2001
28  Nashville extravaganza for having achieved the rank of President's Team in a

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 13

1   company-wide record time of approximately one year, and by featuring Doran Andry
2   on the cover of Herbalife's business Today magazine, which is circulated to all
3   Herbalife distributors), by appearing at NWTW events (for instance, an October 2001
4   NWTW event in Las Vegas was attended by Herbalife's director of marketing), by
5   adopting rules which permitted distributors to develop their own promotional
6   materials, and by refraining from enforcing the requirement that such distributor-
7   developed promotional materials comply with Herbalife's standards and be pre-
8   approved by Herbalife's compliance department.

9       29.   In a memorandum sent to President's Team members in mid to late 2001
10  (the exact date being unknown to Plaintiffs), Herbalife's CEO Tirelli asserted that
11  Lead Generation Systems were "[o]ne of our greatest opportunities [but] also one of
12  our greatest risks" (the "Tirelli Memo"). Tirelli characterized Lead Generation
13  Systems ("LGS") as one side of the "Golden Triangle of Success" (the other sides
14  being "products" and the "Home Office") and noted that he had been communicating
15  this message at every corporate and distributor event he had attended. Tirelli further
16  stated that "Herbalife is committed to take full advantage of all the collective
17  innovative and creative solutions in the marketplace with respect to Lead Generation
18  Systems." Tellingly, the Tirelli Memo warned that "LGS should be an augment to the
19  Herbalife mission and business and should not become more important economically
20  than the Herbalife opportunity."

21      30.   The Tirelli Memo was sent in 2001, in an effort to "close the barn door
22  after the horses were gone." By that time, the Newest Way to Wealth and other
23  LGS's had been in existence for several years, and indeed had constituted a key part
24  of Herbalife's business strategy to revitalize sales and the recruitment of new
25  distributors and Supervisors. For the first time, Herbalife, in the Tirelli Memo,
26  adopted a series of guidelines, effective January 1, 2002, governing the use of LGS.
27  These guidelines included review by Herbalife of every LGS to ensure compliance
28  with legal regulations, industry standards and Herbalife's own standards (although

Page 14

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1  Tirelli emphasized that he would be personally involved in all decisions and was

2  committed to the "innovative and creative use of LGS"; a requirement that at least

3  50% of every LGS should be focused on Herbalife's products; an understanding that

4  the purpose of LGS was to "augment the Herbalife mission and business and should

5  not become more important economically than the Herbalife opportunity;" and a

6  requirement that "all LGS should stay within the Chairman's Club lineage."

7      31.   The new guidelines were addressed to the actual kinds of problems

8  Herbalife was now forced to recognize that it had with LGS in general and with

9  NWTW in particular.  When Tirelli referred to LGS as "one of our greatest risks" he

10  was referring to the adverse impact of regulatory scrutiny which would likely be

11  prompted to the use of deceptive LGS promotional materials and the emphasis on

12  recruiting new distributors over retail selling.  The admonition that at least 50% of a

13  LGS should be devoted to extolling the merits of Herbalife's products is particularly

14  telling, since the primary focus of Herbalife's LGS, including NWTW, was the

15  recruitment of new distributors.  In fact, NWTW materials explicitly advised

16  participants to spend at least 80% of their time and efforts in recruiting new

17  distributors, and only 20% in retailing.  Moreover, in the case of NWTW, Tirelli's

18  admonition that a LGS should not become "more important economically than the

19  Herbalife opportunity" reflected an accomplished fact.

20      32.   Herbalife's LGS initiative in the United States had a significant impact

21  on its financial performance.  In 1997 Herbalife's United States "retail" sales were

22  $298.7 million, approximately 20% of Herbalife's total world-wide retail sales of

23  $1,490.7 million.  As set forth in the following chart, the United States share of

24  Herbalife's sales has increased every year since then, notwithstanding an absolute

25  decline in sales in 2001:

26

27

28

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 15

Herbalife International, Inc.

U.S. Retail Sales vs. Worldwide Retail Sales

| Year | Total Worldwide Retail Sales (in millions) | U.S. Retail Sales (in millions) | U.S. Sales as a percentage of Total Retail Sales |
|------|---------|---------|---------|
| 1993 | 693.1 | 247.0 | 35.6% |
| 1994 | 884.0 | 295.0 | 33.4% |
| 1995 | 923.6 | 333.6 | 36.1% |
| 1996 | 1,200.1 | 279.6 | 23.3% |
| 1997 | 1,490.7 | 298.7 | 20% |
| 1998 | 1,644.8 | 364.5 | 22.2% |
| 1999 | 1,793.5 | 416.1 | 23.2% |
| 2000 | 1,764.9 | 453.0 | 25.7% |
| 2001 | 1,656.2 | 441.7 | 26.7% |

33.    In addition, Herbalife's LGS initiative has resulted in the decrease in sales of "official" corporate promotional literature, presumably due to the increasing sales of distributor-generated LGS promotional literature (which is not publicly reported). As demonstrated in the following chart, prior to the commencement of the LGS initiative in 1997, Herbalife's sales of promotional literature had averaged approximately 5% of total retail sales. Since then such sales have declined every year, both in absolute terms and as a percentage of total sales:

Page 16

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Herbalife International, Inc.

Sales of Promotional Literature

| Year | "Retail Sales" (in millions)** | Sales of Literature, Promotional and Other (in millions) | Promotional Literature as a percentage of total Retail Sales |
|------|------|------|------|
| 1994 | 884.0 | 49.2 | 5.6% |
| 1995 | 923.6 | 35.3 | 3.8% |
| 1996 | 1,200.1 | 60.4 | 5.0% |
| 1997 | 1,490.7 | 69.4 | 4.6% |
| 1998 | 1,644.8 | 67.9 | 4.1% |
| 1999 | 1,793.5 | 46.6 | 2.6% |
| 2000 | 1,764.9 | 50.8 | 2.8% |
| 2001 | 1,656.2 | 25.0 | 1.5% |

** Based on the numbers set forth in this chart, plaintiffs believe that Herbalife's senior distributors are earning tens of millions of dollars in the sale of LGS promotional materials, principally the sale of NWTW materials.

34.    Herbalife's LGS initiative, with its emphasis on recruiting more distributors, has also resulted in the fact that an increasing percentage of Herbalife's sales is comprised of purchases by Supervisors who are meeting their initial and/or annual qualifying purchase requirements. As set forth above, in order to rise to the rank of Supervisor, a distributor must initially qualify by purchasing 4,000 points worth of Herbalife products in one month, or 2,500 points worth of Herbalife products in two consecutive months; and a Supervisor must requalify every year in order to

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1   maintain his or her Supervisor status. Since the inception of Herbalife's LGS

2   initiative in 1997, the percentage of Herbalife's "retail" sales which can be accounted

3   for by Supervisors meeting their qualifying purchase requirements has increased from

4   32.4% of total sales to no less than 40.5%, as set forth in the following chart:

Herbalife International, Inc. Total Retail Sales*

Compared to Minimum Qualifying Purchases by Supervisors

| Year | Supervisors | Minimum qualifying purchases by Supervisors (in millions)* | "Retail" Sales (less promo literature) (in millions)** | Percentage of Retail Sales by qualifying Supervisors |
|------|-------------|-----------|-----------|-----------|
| 1997 | 115,000 | 460 | 1,421.3 | 32.4% |
| 1998 | 139,000 | 556 | 1,576.9 | 35.3% |
| 1999 | 147,000 | 588 | 1,746.9 | 33.7% |
| 2000 | 160,000 | 640 | 1,714.1 | 37.3% |
| 2001 | 165,000 | 660 | 1,631.2 | 40.5% |

\*   To become a Herbalife Supervisor, the distributor must purchase at least 4,000 "points" (approximately equivalent to the suggested retail price, i.e., 1 point equals $1) worth of Herbalife products in one month, or 2,500 points in two consecutive months. The figures in this column are derived by multiplying the number of Supervisors in a given year by 4,000. Accordingly, the minimum qualifying sales are understated, since some Supervisors qualify by purchasing a total of 5,000 points over two months.

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 18

**     Herbalife reports "retail sales" based on the suggested retail sale prices reflected on its invoices to its distributors.

35.     The emphasis on recruitment is also demonstrated by the fact that while Herbalife's sales have been decreasing for the past two years (and the rate of sale growth was increasing for years before that), the number of Supervisors has continued to increase, as set forth in the following chart:

Herbalife International, Inc.

Year-to-year Growth in Number of Supervisors and Retail Sales

| Year | Supervisors | Increase over previous year | "Retail" Sales (in millions)** | Increase (decrease) over previous year |
|------|-------------|-----------------------------|--------------------------------|-----------------------------------------|
| 1991 | 12,000 | | 191.0 | |
| 1992 | 18,000 | 50% | 405.1 | 112.1% |
| 1993 | 41,000 | 127.8% | 693.0 | 71.1% |
| 1994 | 75,000 | 82.9% | 884.0 | 27.6% |
| 1995 | 90,000 | 20% | 923.6 | 4.5% |
| 1996 | 99,000 | 10% | 1,200.01 | 29.9% |
| 1997 | 115,000 | 16.2% | 1,490.7 | 24.2% |
| 1998 | 139,000 | 20.9% | 1,644.8 | 10.3% |
| 1999 | 147,000 | 5.8% | 1,793.5 | 9.0% |
| 2000 | 160,000 | 8.8% | 1,764.9 | (1.6%) |
| 2001 | 165,000 | 3.1% | 1,656.2 | (6.2%) |

**     Herbalife reports "retail sales" based on the suggested retail sale prices reflected on its invoices to its distributors.

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

36.     In sum, the development of Lead Generation Systems such as the Newest Way to Wealth was a central part of Herbalife's business strategy to revitalize sales in the United States market, was consciously developed, implemented and intended by Herbalife and its distributors to encourage the use of deceptive earnings claims and other misrepresentations to promote increased recruitment of distributors and supervisors, and was implemented in a manner intended to permit Herbalife to disclaim responsibility for the acts of its distributors, whom it characterizes as independent contractors.

### D. The Newest Way to Wealth ("NWTW") Scheme

37.     On or before December 1999, pursuant to Herbalife's Lead Generation System initiative, Defendants Dream Builders, H.B. International Group, Inc., Individual Defendants Powell, Andry, Juneja, Beall, Bartholmew and Singleton and other distributors not known to Plaintiffs, conceived, developed and implemented a Lead Generation System dubbed "The Newest Way to Wealth" ("NWTW") to be employed exclusively in the promotion of Herbalife (i.e. the NWTW System).

38.     Ostensibly, the NWTW System is an internet-based mail order system designed to assist Herbalife distributors to:

a.     Recruit customers and potential new Herbalife distributors (i.e. "Lead Generation");

b.     Select "serious people out of th[e] leads without...having to see or even speak to them"; and

c.     Train and follow-up with those serious leads.

39.     In fact, the NWTW System is a fraudulent scheme designed to exhort Herbalife distributors to instantly achieve "Supervisor" status under the Herbalife compensation structure by making a qualifying purchase of Herbalife products, to focus most of their efforts on recruiting new distributors, and to ignore retailing. The NWTW scheme benefits Herbalife because the qualifying purchases to reach the Supervisor level generate substantial sales. The NWTW scheme benefits the

Page 20

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1 Individual Defendants because the qualifying purchases by new Supervisors result in
2 additional royalty and bonus income for them, and it benefits Dream Builders and
3 H.B International because they realize additional profits from the sale of substantial
4 amounts of NWTW promotional materials.  In effect, the NWTW System transforms
5 the Herbalife Sales and Marketing Plan into a pyramid sales scheme, where rewards
6 are paid in connection with recruitment of new participants and not in connection was
7 the sale of products to bona fide consumers.

8     40.    It was part of the NWTW scheme to cause distributors to disseminate
9 promotional materials which fraudulently projected the successful expansion and
10 operation of the Herbalife businesses of NWTW members.  For example, NWTW
11 materials state that:

12   • By using our powerful [NWTW] system, you will dramatically accelerate the
13      growth of your Herbalife business.
14   • If you follow [our] instructions...your business will be up and running in just a
15      few days.  Follow all of the steps exactly.
16   • If you follow all the steps and work with us, [you're] going to be just as
17      successful as the people you've already read about.

18     41.    It was part of the NWTW scheme for participants to disseminate the
19 NWTW promotional materials through the use of the mails and to follow up the
20 mailings with telephone calls, following detailed sales scripts.  The NWTW System
21 called for two mailings, a "First Package" and a "Second Package," each of which
22 was to be followed up with a scripted telephone call.

23     42.    It was also part of the NWTW scheme to exhort NWTW members to
24 become Supervisors under the Herbalife Sales and Marketing Plan, by making the
25 minimum qualifying purchase, and to make substantial purchases of NWTW
26 promotional materials.  NWTW promotional materials were sold in various packages
27 ("Gold," "Silver" and "Platinum") and participants were told that a significant portion
28 of their earnings would be derived from the sale of packages of promotional materials

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 21

1   to their recruits. NWTW also provided participants with pre-selected Herbalife

2   product orders, designed to meet the Supervisor purchase qualifications. The NWTW

3   System also involved efforts to keep new recruits motivated for as long as possible,

4   despite the failure of the system to live up to the expectations created by the

5   promotional materials, so as to increase their purchases of Herbalife products and

6   NWTW promotional materials. These efforts included "focus group" conference calls

7   and the extensive use of Herbalife's "touchfon" voice messaging system, both of

8   which were used to transmit additional training in recruitment techniques and

9   motivational messages intended to boost distributor morale.

10   43.   It was also part of the NWTW scheme to make fraudulent projections

11   concerning the earnings a new Herbalife distributor would expect to earn. The

12   NWTW promotional materials tout the so-called "20K" plan which projects that a

13   Herbalife distributor who makes a minimum investment in the NWTW System will

14   achieve "$20,000 in business every single month...within 30-90 days." Further, these

15   materials project that after 90 days the NWTW System would be "self-funding." *The

16   NWTW Plan is entirely premised on the recruitment of new distributors. NWTW

17   distributors are instructed to spend at least 80% of their time on the recruitment of

18   new distributors* The NWTW materials represents that distributors will not only

19   receive bonuses from Herbalife based on product purchases by their recruits, but that

20   they will make profits on the sale of NWTW promotional materials to their recruits,

21   as well as a bonus directly from NWTW for each new recruit.

22   44.   The NWTW promotional materials make numerous representations

23   concerning the "incredible" incomes which participants can achieve if they buy in at

24   Herbalife's "Supervisor" level and follow the NWTW System, including but not

25   limited to the following:

26   a.   "The Second Package Video will show you how so many others

27   are making incredible incomes with this opportunity. Herbalife has created more

28   millionaires than any other company in the history! Currently, Herbalife has over 500

Page 22

1    people on its prestigious President's Team who are earning between $200,000 per
2    year and $5,000,000 per year! (Yes, you read the amount correctly - $5 Million Per
3    Year). In addition, there are thousands other people earning 6-figure income of
4    $100,000 per year or more. These people come from various backgrounds and
5    ethnicity from welfare moms and 80-year-old grandmothers to teenagers and young
6    adults between the ages of 17 and 19."

7                b.      "Several of these people reached the $100,000 per year income
8    level within 1 year by using our [NWTW] incredible mail order and Internet
9    marketing program."

10                c.      "Your income at the [Herbalife] supervisor level is practically
11   UNLIMITED."

12                d.      "The supervisor position is undoubtedly the most advantageous
13   and lucrative position to start your business, however, if you are not able to start at
14   this level, please consult with your mentor to help you work your way to this level as
15   quickly as possible."

16                e.      "[Herbalife] distributors earn 30-50% more than almost any other
17   company's distributors assuming the same sales volume. In fact, the company
18   [Herbalife's] compensation plan returns 73% OF THE TOTAL NET SALES to its
19   distributors. That means that out of the $1.8 Billion in sales in 1998, $1.3 Billion was
20   paid out to us, the distributors! That translates into incredible earning power for the
21   individual distributor."

22                f       Numerous "testimonial" earnings claims by the Individual
23   Defendants and others, including "Larry & SK Clark, TX: In their first 60 days earned
24   $2,500"; "John & Leslee Beall, IN: By my 11th month in business I was earning over
25   $10,000 per month ... still part-time"; "TJ Juneja, DC: Made over $7,000 per month
26   within 7 months of starting with this program [NWTW] and quit his full time job as a
27   CPA"; "Steve & Debbie Combs, CA: Less than five years ago our financial situation
28   was a disaster. Thanks to this business opportunity we now have financial freedom

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 23

1   and a monthly income of more than $28,000"; "Leah Graham, WA: $30,000 check

2   last month"; and "Bret & Amber Bartholomew, NV: February's check *over *$60,000*

3   *just nine months using mail order!*" (emphasis in original).

4           g.      Other testimonials indicate that most if not all of these alleged

5   earnings are based on recruitment bonuses and commissions, as opposed to retail

6   sales.

7       45.     The NWTW Second Package includes a series of charts showing

8   projected earnings for NWTW/Herbalife distributors, labeled "Five gets Five gets

9   Five Plan", which represents potential earnings ranging from $19,375 to $42,625

10  monthly, "Four gets Four gets Four Plan", which represents potential earnings ranging

11  from $10,500 to $23,100 monthly, and so on.

12      46.     The NWTW Second Package represents that the "Worst Case" is that the

13  distributor will be earning $13,000 per month after 12 months following the program.

14      47.     Defendants Dream Builders, H.B. International Group, Inc. and the

15  Individual Defendants sponsor promotional seminars and distribute promotional

16  literature, video tapes and audio cassettes at or by which prospects are recruited and

17  trained to join the NWTW System and to induce others to also join.  In promotional

18  materials distributed in connection with the NWTW System, and at promotional

19  events sponsored by Herbalife, H.B. International Group, Inc. and Dream Builders,

20  NWTW members deliver "rags-to-riches" testimonials and allude to extraordinary

21  monthly incomes, exhorting the prospects to become Herbalife Supervisors and join

22  the NWTW System.

23      48.     Defendants' representations as to the probabilities of success and their

24  income projections were and are false.  Defendants' representations that the NWTW

25  System is "self-funding" in less than 90 days were and are false.  Despite Defendants'

26  claims, there is in fact little, if any chance that most individuals who purchase the

27  NWTW System distributorships will ever recoup even their initial investment.

28

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 24

49.     In connection with the NWTW System, Defendants have uniformly failed to disclose, in the First Package, the Second Package, the After First Package Call Back Script, the After Second Package Call Back Script, in "focus group" conference calls, "touchfon" voice messages or otherwise, the following material facts:

a.      That investments of money and time in the NWTW System are exceedingly risky because the NWTW System as employed in connection with the Herbalife Sales and Marketing Plan is a pyramid sales scheme, that such schemes inevitably collapse after a period of explosive growth, and most people in pyramid schemes lose money;

b.      That the Federal Trade Commission and state agencies have found the practice of representing by implication, the use of hypothetical examples, or otherwise that distributors in multi-level marketing programs earn or achieve any stated amounts of profits, earnings or sales in excess of the average profits, earnings, or sales of all distributors, to be an "unfair or deceptive act or practice" in violation of law, unless the average profits, earnings or sales or the percent of all distributors who actually achieved such stated profits, earnings or sales is clearly and conspicuously disclosed;

c.      That in order to effectively evaluate the Herbalife Supervisor positions as business opportunities, each of the Defendants should have disclosed the following information to the Plaintiff and to all prospective NWTW members and failed to do so:

(1)     The actual bases for the earnings claims made in connection with the NWTW System's marketing scheme in the uniform promotional materials created and/or approved by the Defendants;

(2)     The number and percentages of Supervisors who actually achieved the earnings or ranges of earnings represented by the Defendants, as well as

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 25

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1   the total number of distributors who acquired interests in each rank of the Herbalife
2   Sales and Marketing Plan, on an annual basis and by geographical area;

3      (3) The number and percentages of distributors who reached
4   each rank in the Herbalife Sales and Marketing Plan as compared to the total number
5   of distributors who acquired interests in the Herbalife Sales and Marketing Plan, on an
6   annual basis and by geographical area;

7      (4) The average income actually earned by distributors at each
8   rank of the Herbalife Sales and Marketing Plan on an annual basis and by
9   geographical area;

10      (5) The average payments and expenses actually made and
11   incurred by distributors at each rank of the Herbalife Sales and Marketing Plan, on an
12   annual basis and by geographical area;

13      (6) The number and percentages of distributors at each level of
14   the Herbalife's Sales and Marketing Plan who voluntarily terminated or failed to
15   renew their positions, who were terminated or refused renewal by Herbalife for any
16   reason, who ceased to be "active", or who otherwise abandoned their positions in the
17   Herbalife Sales and Marketing Plan, on an annual basis and by geographical area; and

18      (7) all other material information which could affect the
19   decision of a reasonable business person.

20     50. Herbalife and the NWTW System employ disclaimers in their contracts
21   and promotional materials which provide that "testimonial" or other representations as
22   to possible earnings are not "guarantees" or "typical." Such disclaimers are
23   insufficient to bar the claims alleged in this lawsuit. Defendants knew and intended
24   for prospective distributors and participants in NWTW to rely on these testimonial
25   earnings claims as reasonable projections of possible earnings. Defendants had no
26   reasonable basis for making these earnings claims and knew that it would be difficult
27   or impossible for more than a tiny fraction of new distributors to achieve similar
28   results. For instance, while President's Team distributors may earn $20,000 per

Page 26

1   month or more, there are only a few hundred such distributors, representing less than
2   0.5% of all Supervisors and a minute percentage of Herbalife's million-plus
3   distributors.

4       51.    In short, the NWTW scheme is characterized by misrepresentations and
5   omissions of material fact. Information provided in video and audio-cassette tapes,
6   and written promotional materials combine to give investors the materially false
7   impression that their investments will be easily recouped, that the promotional
8   campaigns used in the NWTW System will generate new prospects, that distributors
9   will profit from their initial investment with little or no risk, and that the NWTW
10  System will be "self-funding" within 90 days. In fact, only a handful of distributors
11  have achieved the high levels of income represented by Defendants, while the
12  overwhelming majority of NWTW/Herbalife participants suffer an out-of-pocket loss
13  on their initial investment. Persons who attempt to participate in the
14  NWTW/Herbalife program typically lose from $10,000 to $50,000 or more, and a
15  number of them have been forced into personal bankruptcy. Defendants are
16  continuing to promote, approve and/or operate the fraudulent NWTW/Herbalife
17  business opportunity in the State of California and throughout the United States,
18  including its illegal pyramid scheme aspect. These continuing activities further
19  threaten the investments of the Class and will victimize thousands of additional
20  persons unless Defendants are restrained and enjoined. Defendants' activities have
21  inflicted, and will continue to inflict, irreparable harm upon plaintiff, the Class
22  members, and prospective Herbalife distributors who employ the NWTW System.

23      52.    As a result of and in reliance upon the uniform and standardized
24  representations and omissions of each of the Defendants, the Plaintiffs and other
25  NWTW/Herbalife distributors at all levels have become unknowing victims of the
26  NWTW/Herbalife scheme.

27

28

Page 27

## E. Inadequate or Unenforced Retail Sales Requirements

53.    There is no effective and enforceable requirement that the NWTW System distributors actually make retail sales of Herbalife products. The NWTW System calls for distributors to make wholesale purchase of at least the minimum amount of products necessary to maintain their status as Supervisors, regardless of whether the distributor is actually making retail sales, a practice, known as "inventory loading". For example, the projected earnings chart in the NWTW "Second Package" states that:

> These examples will assume that everyone does just the MINIMUM of 2,500 Volume Points to be eligible to receive Royalties, and nothing more! Production Bonuses are paid on infinite levels, [but] for these examples we are just considering our first three levels. (emphasis in original).

54.    NWTW System distributors are encouraged by Defendants to sponsor a recruit with a distributor kit, significant purchases of the NWTW System marketing tools and hundreds if not thousands of dollars of "wholesale" product purchases from Herbalife. The NWTW System emphasizes through its uniform promotional materials the need to continue the on-going recruitment and sponsoring of new distributors into the NWTW System and the maintenance of personal wholesale product purchase volumes. The common practice of NWTW System distributors is to meet much of their purchase volumes by "attempting to sell products" to other recruits, by selling marketing tools and sales aids to recruits, and by inventory loading, as opposed to retailing to the mythical "end consumer."

55.    All of the various techniques endorsed by the NWTW System to "retail" products are actually methods of "prospecting" for new distributors. Retail selling is virtually non-existent and, in any event, secondary to recruitment.

56.    While Herbalife supposedly requires all of its distributors to retail its products, the Herbalife Defendants have failed to monitor and enforce these requirements and have thereby permitted the NWTW System to flourish and grow.

Page 28

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

## G. Recruitment of the Individual and Representative Plaintiffs

57.    Relying on the fraudulent misrepresentations and omissions in the NWTW promotional materials described above, Plaintiff Nancy Jacobs was induced to apply for and become an Herbalife distributor on or about September 7, 2001, a member of NWTW on or about September 10, 2001, a NWTW focus group member on or about September 26, 2001, and a Herbalife Supervisor prior to October 28, 2001.

58.    Plaintiff Jacobs committed herself on a full time basis to the NWTW System. She purchased significant quantities of Herbalife products and NWTW promotional materials, including a "Gold Package" and a "Platinum Package", paid to attend NWTW training sessions including one held in Cleveland, Ohio on or about November 3, 2001, purchased NWTW promotional materials and qualified and became an Herbalife Supervisor prior to October 28, 2001. Plaintiff continued her efforts to learn to use the NWTW System by listening to "at home" audio seminars offered over the telephone and internet, logging on to "focus group" conference calls, and by purchasing NWTW training tapes and compact disks.

59.    After nearly three and one-half months of exhaustive work conducted in accordance with the training materials Plaintiff Jacobs obtained from the NWTW System, Dream Builders, Herbalife and the other Defendants, Jacobs found herself nearly bankrupt and without income. She also had an abundance of sales aids and products which she was unable to dispose of at a fair sale or refund price.

60.    Once Jacobs recognized that the NWTW System was an illegal practice, she withdrew from participation and sought the advice of legal counsel.

61.    Sanchez became a Herbalife distributor on or about March 30, 2000. Sanchez received a NWTW "After First Package Call Back Script" and NWTW "Second Package" via mail on or about April 1, 2001 which was sent out at the direction of the Tustakawa defendants. Relying on the fraudulent misrepresentations and omissions in the NWTW promotional materials described above, Plaintiff

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 29

1   Sanchez was induced to apply for and become a NWTW distributor on or about April
2   23, 2001.

3       62.    Sanchez committed herself on a full time basis to the NWTW System.
4   She purchased significant quantities of Herbalife products, attended NWTW training
5   sessions, purchased NWTW promotional materials and qualified and became an
6   Herbalife Supervisor prior to July 1, 2001. Plaintiff continued her efforts to learn the
7   NWTW System by listening to "at home" audio seminars offered over the telephone
8   and internet, logging on to "focus group" conference calls, and by purchasing NWTW
9   training tapes and compact disks.

10      63.    After several months of exhaustive work conducted in accordance with
11  the NWTW promotional and training materials which she purchased, Sanchez was
12  forced to declare personal bankruptcy. She also had an abundance of sales aids and
13  products which she was unable to dispose of at a fair sale or refund price.

14      64.    Once Sanchez recognized that the NWTW System was an illegal
15  practice, she withdrew from participation and sought the advice of legal counsel.

16      65.    On information and belief, thousands of additional individuals who
17  invested in the NWTW/Herbalife System are now inactive and have sustained the loss
18  of most or all of their investments and have sustained additional economic loss.

19  **H.    Herbalife's Knowledge, Approval and Participation in the NWTW
20           System**

21      66.    As alleged above, Herbalife jointly manages the Herbalife network
22  marketing system with its elite group of President's Club distributors. Herbalife
23  conceived of and adopted Lead Generation Systems, developed by its high level
24  distributors, as a crucial part of its business strategy to revitalize sales following the
25  substantial decline in U.S. sales in 1996.

26      67.    As alleged above, NWTW was the largest LGS in Herbalife's network
27  marketing system. Moreover, NWTW was developed and operated by Doran Andry,
28  a member of Herbalife's Chairman's Club, the highest level in the Herbalife

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 30

1  Marketing and Sales Plan, as well as prominent President's Team members, including
2  Individual Defendants Anthony Powell, Tarun Juneja, Stephen and Debera Combs,
3  and Craig and Caroline Tsutakawa.

4      68.    Shortly after the NWTW System was conceived and implemented,
5  Herbalife obtained, reviewed and authorized the dissemination and use of the uniform
6  sales, marketing and promotional materials employed in connection with the NWTW
7  System.

8      69.    On information and belief, at some time after the inception of the
9  NWTW System in December, 1999 and prior to May of 2001 (the exact date is known
10  to the Herbalife Defendants but not to the Plaintiffs), Herbalife began noticing
11  unusual levels of activity among certain Herbalife distributors, either in the form of
12  unusually high levels of Herbalife product purchases or unusually rapid promotions
13  through the levels of the Herbalife Sales and Marketing Plan, or both. Herbalife's
14  legal department conducted an unknown number of interviews of these Herbalife
15  distributors, and determined that they were employing the NWTW promotional
16  system in connection with their Herbalife distributorships.

17      70.    In May, 2001, Herbalife held a sales and training session in Nashville,
18  Tennessee for its top distributors (the "Nashville Extravaganza"). The Nashville
19  Extravaganza was attended by Defendants Powell and Juneja, among other Individual
20  Defendants, and by many "20-K Plan" members of the NWTW System. Both the
21  "20-K Plan" members and Defendant Powell prominently displayed themselves with
22  NWTW System "Campaign" buttons and banners. At the Extravaganza, Defendant
23  Powell was recognized for achieving his President's Team membership in the
24  Herbalife business in a company-wide record time of approximately one year.

25      71.    Around the time of or just prior to the Nashville Extravaganza,
26  Defendants Juneja and Powell met with Herbalife to discuss the NWTW promotional
27  materials. Among the representatives of Herbalife at this meeting were then Chief
28  Executive Officer of Herbalife, Christopher Pair, now resigned, and Herbalife director

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 31

1  and current CEO Tirelli.  This meeting did not result in any material change in the
2  NWTW promotional materials or system.

3      72.    Shortly after Tirelli became Herbalife's CEO, he met with Juneja,
4  Powell, S. Combs and D. Combs and Herbalife's in house counsel to discuss the
5  NWTW promotional materials.  This meeting did not result in any material change in
6  the NWTW promotional materials or system.

7      73.    As a result of Herbalife's internal investigation, and the meetings with
8  Juneja and Powell, Tirelli and other director and executive officers of Herbalife have
9  had ample time to review the promotional materials employed in the NWTW System,
10  and to determine that they are fraudulent, deceptive and violate Herbalife's own
11  standards.

12      74.    It was not until shortly after the filing of this lawsuit, however, that
13  Herbalife finally took some action to enforce its rules and contractual requirements
14  regarding earnings claims and other misrepresentations.  On March 1, 2002, Herbalife
15  suspended Defendants Powell and Juneja for their role in the NWTW scheme.

16      75.    On or about January 8, 2002, certain distributors of the NWTW System
17  participated on a conference call to voice their concerns about the NWTW System,
18  the financial losses that they had sustained because of the NWTW System, and the
19  possible use that they might make of a lead generation system other than the NWTW
20  System.  During that call, Defendant Powell, who had not been invited to participate,
21  was connected to the conference call announcing that the participants' identities were
22  known to Herbalife, that their conduct in considering an alternate lead generation
23  system to the NWTW System would be dealt with severely by Herbalife, and that
24  Tirelli had been connected to the call and was monitoring the conversation of the
25  participants.

26
27
28

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 32

## IV. THE NEED FOR INJUNCTIVE RELIEF

76.    Defendants are continuing the deceptive and fraudulent NWTW promotional scheme (i.e., the NWTW System) in conjunction with the Herbalife Sales and Marketing Plan. Herbalife has utterly failed to enforce the policies and procedures which were ostensibly designed to preclude the operation of the Herbalife Sales and Marketing Plan as an illegal pyramid scheme. Defendants have demonstrated every inclination to continue defrauding current and prospective Herbalife distributors through the use of the NWTW promotional scheme. Injunctive relief is essential in order to prevent further injury.

## V. CLASS ACTION ALLEGATIONS

77.    Individual and Representative Plaintiffs brings this Class Action on behalf of themselves, and on behalf of all other persons similarly situated, as members of the Plaintiff Class. Plaintiffs request that this Court certify the Plaintiff Class, or appropriate subclasses thereof, initially defined as all residents of the United States who, at any time from December 1, 1999 to the date the Class is certified in this action (the "Class Period"):

a) were Herbalife distributors at the Supervisor level or higher;

b) either executed the NWTW Distributor Agreement or purchased NWTW promotional materials for use with their Herbalife distributorship; and

c) incurred net economic loss.

The Defendants, any entity in which any of them have a controlling interest, and their legal representatives, heirs, and successors, are expressly excluded from membership in the Plaintiff Class and any subclasses thereof, to avoid conflict of interest.

78.    This action has been brought and may properly be maintained, pursuant to the provisions of Fed. R. Civ. P. 23(a)(1) through (4), 23(b)(1), (2) and/or 23(b)(3); and satisfies the numerosity, commonality, typicality, adequacy, impairment and superiority requirements thereof, because:

Page 33

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

A. The members of the Class are so numerous that their individual joinder herein is impractical. The Class is believed to number over 5,000 members. Individual and Representative Plaintiff Jacobs invested and lost in excess of $13,000 in Defendants' fraudulent business opportunity and Plaintiff Sanchez lost over $20,000. The remaining aggregate out-of-pocket loss of the Class is estimated to exceed $40 million. If the Court determines notice to be necessary or appropriate, Class members may be notified of the pendency of this action by mail, supplemented or substituted by published notice.

B. Common questions of law and fact exist as to all members of the Class. These questions predominate over any questions which affect only the individual members of the Class. These common legal and factual questions include:

   (1)   Whether the Defendants conducted or participated in the affairs of a RICO Enterprise through a pattern of racketeering activity, as alleged in this Complaint;

   (2)   Whether the Defendants committed or conspired to commit the predicate acts alleged in this Complaint;

   (3)   Whether the use of the NWTW promotional system in conjunction with the Herbalife sales and compensation plan results in an Endless Chain scheme in violation of California Penal Code 327;

   (4)   Whether the sale of the NWTW promotional system in conjunction with the Herbalife sales and compensation plan constitutes a Seller Assisted Marketing Plan pursuant to California Civil Code §1812.201;

   (5)   Whether the NWTW promotional documents and materials, including video presentations and audio tapes, prepared and disseminated by Defendants to the Class misrepresented or omitted material facts about the benefits, prospects, interrelationships, financial condition,

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 34

1    activities of, and the safety, security, and economic benefits of the

2    business opportunities offered in Herbalife and/or Dream Builders;

3    (6)    Whether the NWTW documents and materials, audio tapes and video

4    presentations misrepresented material facts relative to the true value

5    of Herbalife's distributorships, and the economic benefits which

6    could be obtained by serving as one of Herbalife's Supervisors;

7    (7)    Whether the Defendants were aware of and misrepresented or omitted

8    material facts relative to the true value of Herbalife's business

9    opportunities, and the economic benefits which could be obtained by

10    serving as one of Herbalife's Supervisors;

11    (8)    Whether the Defendants acted willfully, recklessly or with gross

12    negligence in omitting to state and/or misrepresenting material facts

13    with respect to the foregoing, in aiding and abetting, or in controlling

14    such misstatements;

15    (9)    Whether Defendants operated Herbalife and/or the NWTW System as

16    a deceptive business practice, and/or an illegal pyramid or endless

17    chain scheme; and

18    (10)    Whether the members of the Class have sustained damages as a result

19    of Defendants' wrongdoing; and, if so, what is the proper measure and

20    appropriate formula of damages.

21    C. Individual and Representative Plaintiffs' claims are typical of those of the

22    proposed Plaintiff Class, since Plaintiffs made investments similar to those of

23    the Class, and the proposed Plaintiff Class is defined to include all persons and

24    entities (except Defendants and affiliates and insiders as set forth above) who

25    made such investments. Furthermore, Plaintiffs and all members of the

26    Plaintiff Class have sustained monetary damages arising out of Defendants'

27    wrongful conduct in violation of RICO and California law as alleged herein.

28

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 35

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1   D. Plaintiff will fairly and adequately protect the interests of the members of the

2   Class. The named Plaintiff has no interests which are adverse to the interests of

3   the Class members. Plaintiff Jacobs lost over $13,000.00 in Defendants'

4   fraudulent business opportunity scheme. Plaintiff Sanchez lost over $20,000.

5   These losses provide them with substantial stakes in this action and the

6   incentive to prosecute it vigorously for themselves and for the Class. The

7   named Plaintiffs have retained counsel competent and experienced in class

8   actions, franchising and distribution law and consumer protection litigation,

9   and intend to pursue this action vigorously.

10   E. A class action is superior to other available methods for the fair and efficient

11   adjudication of the litigation since individual joinder of all damaged

12   distributors is impracticable. Although the damages suffered by each

13   individual Class member may total thousands or even tens of thousands of

14   dollars, damages of such magnitude are nonetheless relatively small given the

15   expense and burden of individual prosecution of the complex and extensive

16   litigation necessitated by the fraudulent promotion of a business opportunity or

17   illegal pyramid scheme. Thus, it would be virtually impossible for the Class

18   members to effectively individually redress the wrongs done to them. Even if

19   the Class members themselves could afford such individual litigation, the Court

20   system could not. Individualized litigation presents the potential for

21   inconsistent or contradictory judgments. Individualized litigation magnifies the

22   delay and expense to all parties, and to the court system, presented by the

23   complex legal and factual issues of the case. By contrast, the class action

24   device presents far fewer management difficulties, and provides the benefits of

25   unitary adjudication, economy of scale, and comprehensive supervision by a

26   single court.

27   F. The foregoing allegations demonstrate the satisfaction of the basic certification

28   criteria of Fed. R. Civ. P. 23(a)(1)-(4) and 23(b)(3) and the requirements for

Page 36

1    voluntary, or opt-out certification under Fed. R. Civ. P. 23(c)(2). However, the

2    circumstances of this litigation may likewise justify the certification of the

3    proposed Plaintiff Class on a mandatory (non-opt out) basis under Fed. R. Civ.

4    P. 23(b)(1)(A) and/or (B), because the prosecution of separate actions by the

5    members of the proposed Plaintiff Class in the federal and/or state courts would

6    create a risk of (A) inconsistent or varying adjudication with respect to

7    individual members of the Class which would establish incompatible standards

8    of conduct for the party opposing the Class, or (B) adjudication with respect to

9    individual members of, the Class which would as a practical matter be

10   dispositive of the interests of the other members not party to the adjudications

11   or substantially impair or impede their ability to protect their interests.

12   G. In conducting the unlawful racketeering enterprise alleged herein and by

13   omitting and concealing material facts regarding the scheme from prospective

14   distributors, Defendants have acted or refused to act on grounds generally

15   applicable to the Class, thereby making appropriate final injunctive relief or

16   corresponding declaratory relief with respect to the Class as a whole, and

17   making appropriate class certification under Fed. R. Civ. P. 23(b)(2).

## VI.  CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**(Violation of 18 U.S.C. §1962(c))**

**(Against All Defendants)**

79.    Plaintiffs, on behalf of themselves and all others similarly situated,
reallege, as if fully set forth, each and every allegation contained in the preceding
paragraphs, and further allege:

80.    Defendants are "persons" within the meaning of 18 U.S.C. §1961(3).

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 37

1   81.   Plaintiffs and each member of the Class are "persons" within the

2   meaning of 18 U.S.C. §1961(3).

3   82.   Since no later than December of 1999, and continuing up to and

4   including the date of the filing of the initial complaint in this action, in the Central

5   District of California and elsewhere, defendants Herbalife International, Inc.,

6   Herbalife International of America, Inc., Dream Builders & Associates International,

7   Inc., H.B. International Group, Inc., the Individual Defendants and other high level

8   Herbalife distributors whose identities are not known to Plaintiff but will be revealed

9   during discovery, have collectively constituted an "enterprise," as that term is defined

10  in 18 U.S.C. §1961(4), that is, a group of business entities and individuals associated

11  in fact, which was engaged in, and the activities of which affected, interstate

12  commerce. Each defendant participated in the operation and management of the

13  NWTW Enterprise.

14   83.   The ostensible purpose of the NWTW Enterprise is to develop and

15  employ a Lead Generation System to assist Herbalife distributors to sell Herbalife

16  products and to recruit new Herbalife distributors, consistent with the Herbalife Sales

17  and Marketing Plan. The actual purpose of the NWTW Enterprise was to achieve the

18  Defendant's shared goals of increasing the recruitment of new distributors through

19  unlawful means including the use of fraudulent and deceptive promotional materials

20  and recruitment techniques as set forth in detail above and to conceal the fact that the

21  combination of the Herbalife Sales and Marketing Plan with the NWTW System

22  resulted in an unlawful pyramid scheme, in which only a few participants would

23  benefit at the expense of the thousands who would lose all or most of their

24  investment.

25   84.   The NWTW Enterprise is separate and distinct from the predicate acts

26  and the pattern of racketeering activity alleged herein. The NWTW Enterprise had

27  and has a continuity of structure, despite various changes in the membership of the

28  association in fact which constantly fluctuates as new distributors are recruited and

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 38

1  existing distributors are terminated or cease active participation in the Herbalife Sales
2  and Marketing Plan.

3      85.    Each of the Defendants was associated with the NWTW Enterprise and
4  conducted or participated, directly or indirectly, and/or conspired to conduct or
5  participate, in the affairs of the NWTW Enterprise through a pattern of racketeering
6  activity as set forth herein.

7      86.    The roles of each of the Defendants were generally as follows:

8      (a)    The Individual Defendants promoted NWTW through their
9  "leadership roles" as high level Herbalife distributors, including but not limited to
10  recruiting and training Herbalife distributors in the use of the NWTW System,
11  participating in special, Herbalife-arranged conference calls, speaking at Herbalife-
12  sponsored training events, and by developing, reviewing, approving and distributing
13  the NWTW promotional materials and system exclusively for use by Herbalife
14  distributors.

15      (b)    Defendants Dream Builders and H.B. International Group, Inc.
16  developed and distributed the NWTW promotional materials and system exclusively
17  for use by Herbalife distributors.

18      (c)    The Herbalife Defendants administered the Herbalife Sales and
19  Marketing Plan, without which NWTW would have no reason to exist, incorporated
20  the concept of distributor-developed Lead Generation Systems into Herbalife's
21  business plan, encouraged and faciliated senior Herbalife distributors to develop LGS
22  such as NWTW, granted leadership roles to the Individual Defendants and thereby
23  granted Herbalife's imprimatur to their promotional methods and the NWTW System,
24  developed and facilitated policies which were consciously intended to promote
25  NWTW, including policies permitting senior distributors to develop their own
26  promotional materials, refraining from enforcing retail selling requirements and
27  refraining from enforcing prohibitions against deceptive earnings claims.

28

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 39