

ROBERT C. SCHUBERT S.B.N. 62684
JUDEN JUSTICE REED S.B.N. 153748
AARON H. DARSKY S.B.N. 212229
SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, California 94111
Telephone: (415) 788-4220
Facsimile: (415) 788-0161

DOUGLAS M. BROOKS
EDWARD L. MANCHUR
GILMAN AND PASTOR, LLP
999 Broadway, Suite 500
Saugus, MA 01906
Telephone: (781) 231-7850
Facsimile: (781) 231-7840

Attorneys for the Representative Plaintiffs
Nancy Jacobs and Annette M. Sanchez,
Individually and on behalf of all others
similarly situated; and on behalf of the
general public

FILED
CLERK, U.S. DISTRICT COURT

MAY - 2 2003

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

NANCY JACOBS and ANNETTE M.
SANCHEZ, Individually On Behalf Of
Themselves And All Others Similarly
Situated, and on Behalf of the General Public,

Plaintiffs,

vs.

HERBALIFE INTERNATIONAL, INC.,
HERBALIFE INTERNATIONAL OF
AMERICA, INC., DREAM BUILDERS &
ASSOCIATES INTERNATIONAL, INC.,
H.B. INTERNATIONAL GROUP, INC.,
ANTHONY POWELL, DORAN ANDRY,
CRAIG M. TSUTAKAWA, CAROLINE
TSUTAKAWA, TARUN JUNEJA, JOHN
BEALL, BRETT BARTHOLOMEW, LEAH
SINGLETON, STEPHEN COMBS and
DEBERA COMBS,

Defendants.

Case No. CV-02-1431 SJO (RCx)

**PLAINTIFFS' SECOND
AMENDED COMPLAINT**

JURY TRIAL DEMANDED

ENTER ON ICMS

MAY - 5 2003

# Table of Contents

NATURE OF CLAIMS ....................................................................... 1

JURISDICTION AND VENUE ........................................................... 3

PARTIES ........................................................................................... 4

   Plaintiffs ........................................................................................ 4

   Herbalife Defendants .................................................................... 5

   NWTW Defendants ....................................................................... 5

FACTS COMMON TO ALL CAUSES OF ACTION .......................... 12

   Background of Herbalife ............................................................... 12

   The Herbalife Sales and Marketing Plan ...................................... 14

   Herbalife Fails to Enforce Retail Sales Rules ............................... 17

DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS WERE MADE

WITH SCIENTER ............................................................................. 19

   Background of Herbalife's Lead Generation Systems .................... 19

   The Newest Way to Wealth ("NWTW") Scheme ............................ 28

   Herbalife's Knowledge, Approval and Control Over the NWTW System ... 37

FACTS REGARDING INDIVIDUAL AND REPRESENTATIVE PLAINTIFFS ... 41

THE ALLEGED SECURITIES ........................................................... 43

   The Herbalife Securities ............................................................... 43

   The Herbalife/NWTW Securities ................................................... 44

FRAUDULENT CONCEALMENT ..................................................... 44

THE NEED FOR INJUNCTIVE RELIEF ........................................... 44

CLASS ACTION ALLEGATIONS ..................................................... 46

CLAIMS FOR RELIEF ...................................................................... 50

   COUNT I ...................................................................................... 50

   (Against All Defendants for Violation of Section 12(1) of the Securities Act) ... 50

   COUNT II ..................................................................................... 51

   (Against All Defendants for Violation of Section 12(2) of the Securities Act) ... 51

   COUNT III ................................................................................... 54

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

(Against Herbalife Pursuant to Section 15 of the Securities Act for Violation of Section 12(2) of the Securities Act) ................................................................................................................... 54

COUNT IV ................................................................................................................................ 55

(Against All Defendants for Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder) ......................................................................................................... 55

COUNT V .................................................................................................................................. 56

(Against the Herbalife Defendants Pursuant to Section 20(a) of the Exchange Act for Violation of Section 10(b) of the Exchange Act) ........................................................................................ 56

COUNT VI ................................................................................................................................. 58

(Fraud and Deceit Against All Defendants) .............................................................................. 58

COUNT VII ............................................................................................................................... 59

(Endless Chain Scheme in Violation of California Penal Code §327 Against All Defendants) .... 59

COUNT VIII .............................................................................................................................. 59

(Violation of California Seller Assisted Marketing Plans LawAgainst All Defendants) ............... 59

COUNT IX ................................................................................................................................. 61

(Unlawful, Unfair or Deceptive Business Practices in Violation of California Business and Professions Code Section 17200 et seq. Against All Defendants) ................................................ 61

PRAYER FOR RELIEF ............................................................................................................ 62

DEMAND FOR JURY TRIAL .................................................................................................. 64

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1    Individuals and representative plaintiffs, Nancy Jacobs and Annette M. Sanchez,
2  on behalf of themselves and all others similarly situated, based on the investigation of
3  their counsel, review of public filings and promotional materials and information
4  supplied by other victims of the fraudulent pyramid scheme described herein, allege
5  as follows:

## NATURE OF CLAIMS

8    1.    These claims are brought by plaintiffs under the Securities Act of 1933
9  (the "Securities Act"), the Securities and Exchange Act of 1934 (the "Exchange
10 Act"), common law fraud, the California Endless Chain Scheme law (California Penal
11 Code Section 327), the California Seller Assisted Marketing Plan law (California
12 Civil Code Section 1812.200, et seq.), and California Business and Professions Code
13 Section 17200, et seq.

14   2.    During the Class Period defined below, defendants sold and solicited the
15 sale of distributorships in the Herbalife multi-level marketing system, pursuant to the
16 Herbalife Sales and Marketing Plan.  Defendants also developed and sold a
17 promotional scheme within Herbalife known as "The Newest Way to Wealth"
18 (hereinafter referred to as the "NWTW System" or simply "NWTW").  The NWTW
19 System consists of a series of uniform and standardized written promotional materials,
20 video and audio tapes and scripted telephone conferences which the defendants
21 designed and used to solicit investments in Herbalife.

22   3.    A multi-level marketing system in which participants pay money for (1)
23 the right to sell a product and (2) the right to receive, in return for recruiting other
24 participants into the program, rewards which are unrelated to the sale of the product to
25 ultimate users, is a pyramid scheme.  In order to avoid being a pyramid scheme, a
26 multi-level marketing system must have effective provisions which ensure that most
27 products are actually retailed to bona fide consumers.  Investments in a pyramid
28 scheme constitute securities both under the Securities Act and the Exchange Act.

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1      4.     In their original complaint, plaintiffs alleged that the combination of the

2 NWTW System and the Herbalife marketing plan constituted an unlawful pyramid

3 scheme because, inter alia, the NWTW System was premised on widespread and

4 systematic violations of Herbalife's rules regarding retail selling.  Subsequent to the

5 filing of their original complaint, and based on the continuing investigation of their

6 counsel, plaintiffs have determined that Herbalife's failure to ensure adequate retail

7 selling during the Class Period was endemic, and not limited to the NWTW System.

8 Accordingly, the Herbalife Sales and Marketing Plan, both standing alone and in

9 combination with the NWTW System, constitutes a pyramid scheme, in which

10 participants pay consideration for the right to receive compensation when new

11 participants join or make purchases, which compensation is unrelated to actual retail

12 sales made to persons who are not also participants in the scheme.

13      5.     Investments in the Herbalife Sales and Marketing Plan, both alone and in

14 combination with investments in the NWTW System, constitute securities for

15 purposes of both the Securities Act and the Exchange Act.  In this Complaint,

16 plaintiffs have pleaded, in the alternative, both that investments in the Herbalife Sales

17 and Marketing Plan are securities ("Herbalife Securities") and that investments in the

18 combination of the Herbalife Sales and Marketing Plan and the NWTW System are

19 securities ("Herbalife/NWTW Securities").  Neither the Herbalife Securities nor the

20 Herbalife/NWTW Securities were registered pursuant to Section 6 of the Securities

21 Act, and therefore defendants' sales of such securities to the plaintiffs and the

22 proposed classes violated Section 5(a) of the Securities Act and are actionable under

23 Section 12(1) of the Securities Act.

24      6.     In addition, plaintiffs allege that the uniform and standardized NWTW

25 promotional materials which defendants used to sell Herbalife distributorships made

26 fraudulent earnings claims and fraudulently omitted material facts, including that the

27 purported Herbalife "business opportunity" was a pyramid scheme, that the individual

28 defendants were making more money selling promotional materials than selling

Herbalife products, that the earnings claims made in the promotional materials were

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1  exceedingly unlikely to be achieved, and that the majority of participants dropped out
2  after losing most of their investments.  Defendants therefore violated both Section
3  12(2) of the Securities Act and Section 10(b) of the Exchange Act, and Rule 10b-5
4  promulgated thereunder.

5
6                          **JURISDICTION AND VENUE**

7       7.     The claims asserted herein arise under and pursuant to Sections 12 and
8  15 of the Securities Act of 1933 and Sections 10(b) and 20(a) of the Securities
9  Exchange Act of 1934 and Rule 10b-5 (17 C.F.R. §240.10b-5), promulgated
10 thereunder by the Securities and Exchange Commission, as well as the statutory and
11 common law of the State of California.

12      8.     Plaintiffs previously alleged claims pursuant to the Racketeer Influenced
13 and Corrupt Organizations sections of Title IX of the Organized Crime Control Act of
14 1970,  18 U.S.C. §§1961-1968 ("RICO").  By Order dated April 16, 2003, the Court
15 held that plaintiffs had sufficiently alleged, against all defendants, claims for violation
16 of sections 1962(c) and 1962(d) of RICO, but for the provisions of the Private
17 Securities Litigation Reform Act of 1995, which amended RICO so that "no person
18 may rely upon any conduct that would have been actionable as fraud in the purchase
19 or sale of securities to establish a violation of section 1962."  The Court therefore
20 ordered plaintiffs to file an amended complaint which deleted the RICO claims and
21 stated securities claims.

22      9.     This Court has jurisdiction of this action pursuant to Section 22 of the
23 Securities Act, 15 U.S.C. §77v, Section 27 of the Exchange Act, 15 U.S.C. §78aa, 28
24 U.S.C. §1331 (federal question), 28 U.S.C. §1337 (regulation of commerce), and 28
25 U.S.C. §1367 (supplemental jurisdiction).

26      10.    Venue is proper in this District pursuant to Section 27 of the Exchange
27 Act and 28 U.S.C. §1391(b).  Many of the acts alleged herein occurred in this District,
28 defendant Herbalife International of America, Inc. is organized under the laws of the
   State of California, and defendants Herbalife International, Inc., Herbalife

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

                                                              Page 3

1    International of America, Inc. and H.B. International Group, Inc. each maintains its

2    principal offices in this District.

3         11.    In connection with the acts and conduct alleged in this Second Amended

4    Class Action Complaint ("Complaint"), the defendants, and each of them, directly or

5    indirectly, utilized the mail, the wires, and the instrumentalities of interstate

6    commerce in carrying out the pyramid scheme and unlawful and fraudulent trade

7    practices which are the subject of this action.

## PARTIES

### Plaintiffs

12.    At all relevant times, plaintiff Nancy Jacobs ("Jacobs") was a resident of
Wheaton, Illinois and invested and lost approximately $9,700 in the defendants'
pyramid scheme during the Class Period, as set forth in the Certification attached
hereto as Exhibit A.

13.    At all relevant times, plaintiff Annette M. Sanchez ("Sanchez") was a
resident of Roseville, California and invested and lost approximately $24,500 in the
defendants' pyramid scheme during the Class Period, as set forth in the Certification
attached hereto as Exhibit B.

14.    As further set forth below (in the section "Class Action Allegations")
plaintiffs Jacobs and Sanchez bring this action in their individual and representative
capacities on behalf of a proposed class and appropriate subclasses of Herbalife
distributors at the Supervisor level or higher in the United States who, during the
period February 19, 1998 to the present, purchased Herbalife products and/or NWTW
promotional materials, and who incurred resulting losses (the "Class"). Plaintiffs
Jacobs and Sanchez are both members of the proposed class.

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 4

## Herbalife Defendants

15.     At all times relevant, defendant Herbalife International, Inc. was a corporation organized and existing under the laws of the State of Nevada having its principal place of business at 1800 Century Park East, Los Angeles, California 90067.

16.     At all times relevant, defendant Herbalife International of America, Inc. was a corporation organized and existing under the laws of the State of California, having its principal place of business at 1800 Century Park East, Los Angeles, California 90067.  At all relevant times, Herbalife International of America, Inc. had common and/or overlapping management with and was and is owned and controlled by Herbalife International, Inc.  Defendants Herbalife International, Inc. and Herbalife International of America, Inc. are collectively referred to herein as "Herbalife" or the "Herbalife Defendants" except where the context indicates otherwise.

17.     At all times relevant, the Herbalife Defendants had common and/or overlapping management with defendant Dream Builders & Associates International, Inc., as described more fully in paragraphs 18, 21, and 34-37.

## NWTW Defendants

18.     During most of the Class Period, defendant Dream Builders & Associates International, Inc. ("Dream Builders") was a corporation organized and existing under the laws of the State of Nevada, having its principal place of business at 1004 Central Avenue South, Kent, Washington 98032-6103.  Dream Builders operated under the d/b/a or fictitious name "The Newest Way to Wealth," and distributed and disseminated the NWTW promotional materials described herein.  Dream Builders was a closely held corporation used by individual defendants Powell, Juneja, Beall, Bartholomew, Singleton and others to promote and sell the NWTW System and disseminate the NWTW promotional materials.  By virtue of its dissemination of the NWTW promotional materials, Dream Builders is a seller as to each and every member of the proposed Class.

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

19.     During the Class Period, defendant H.B. International Group, Inc. was a corporation organized and existing under the laws of the State of Nevada, having its principal place of business at 1241 E. Dyer Road #110, Santa Anna, California 92705-5750, and used by defendant Andry and others to promote and sell the NWTW System and promotional materials described below. By virtue of its dissemination of the NWTW promotional materials, defendant H.B. International Group, Inc. is a seller as to each and every member of the proposed Class.

20.     Defendant Anthony Powell ("Powell") was an executive officer and/or director of Dream Builders and was actively engaged in business in this District on behalf of Herbalife and Dream Builders and committed the wrongs alleged herein in this District and throughout the United States. During all times relevant hereto, Powell had the ability to and did in fact control the affairs of Herbalife, H.B. International Group, Inc. and Dream Builders. In 2001 Powell achieved the rank of "President's Team" in the Herbalife Sales and Marketing Plan. Powell, along with other of the defendants, conceived, authorized the use of and operated the Lead Generation System known as "The Newest Way to Wealth" ("NWTW" or the "NWTW System"), the fraudulent pyramid scheme complained of herein, made the misrepresentations alleged herein, and drafted and/or adopted the fraudulent NWTW promotional materials discussed below. By virtue of his activities in promoting the NWTW System, and drafting and disseminating the NWTW promotional materials, defendant Powell is a seller as to each and every member of the proposed Class.

21.     Defendant Doran Andry ("Andry") is one of Herbalife's top distributors, a member of Herbalife's Chairman's Club, the highest level in the Herbalife Sales and Marketing Plan. During times relevant hereto, Andry represented that he earned $500,000 per month from his Herbalife business. Andry is president, chief executive officer and/or director of defendant H.B. International Group, Inc., and a close associate of defendant Powell. Andry and defendant Powell were actively involved in the conception, formation and operation of the NWTW System as alleged herein. As a member of Herbalife's Chairman's Club, Andry met regularly with the officers and

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1   directors of Herbalife to set Herbalife's policies, procedures and regulations
2   governing all distributor representations and solicitations.  At all times relevant,
3   Andry had the ability to and did in fact, control, conduct or participate in the affairs of
4   Herbalife, H.B. International Group, Inc. and Dream Builders.  Andry authorized the
5   use of the NWTW System, the fraudulent business opportunity complained of herein,
6   made the misrepresentations alleged herein, and drafted and/or adopted the fraudulent
7   NWTW promotional materials discussed below.  By virtue of his activities in
8   promoting the NWTW System, and drafting and disseminating the NWTW
9   promotional materials, defendant Andry is a seller as to each and every member of the
10  proposed Class.

11       22.     Defendant Craig M. Tsutakawa ("C.M. Tsutakawa") is one of
12  Herbalife's top distributors, and achieved the rank of President's Team in November
13  1999.  At all times relevant, C.M. Tsutakawa had the ability to and did in fact, control,
14  conduct or participate in the affairs of defendants Dream Builders, H.B. International
15  Group, Inc. and Herbalife.  C.M. Tsutakawa was a close associate of defendant
16  Powell and was actively involved in the conception, formation and/or operation of the
17  NWTW System,  authorized the use of the NWTW System, the fraudulent business
18  opportunity complained of herein, made the misrepresentations alleged herein, and
19  drafted and/or adopted the fraudulent NWTW promotional materials discussed below.
20  By virtue of his activities in promoting the NWTW System, and drafting and
21  disseminating the NWTW promotional materials, defendant C.M. Tsutakawa is a
22  seller as to each and every member of the proposed Class.

23       23.     Defendant Caroline Tsutakawa ("Tsutakawa") is one of Herbalife's top
24  distributors, and achieved the rank of President's Team in November of 1999.  At all
25  times relevant, Tsutakawa had the ability to and did in fact, control, conduct or
26  participate in the affairs of defendants Dream Builders, H.B. International Group, Inc.
27  and Herbalife.  Tsutakawa was a close associate of defendant Powell and was actively
28  involved in the conception, formation and/or operation of the NWTW System,
    authorized the use of the NWTW System, the fraudulent business opportunity

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1   complained of herein, made the misrepresentations alleged herein, and drafted and/or
2   adopted the fraudulent NWTW promotional materials discussed below.  By virtue of
3   her activities in promoting the NWTW System, and drafting and disseminating the
4   NWTW promotional materials, defendant Tsutakawa is a seller as to each and every
5   member of the proposed Class.

6       24.    Defendant Tarun Juneja ("Juneja") is one of Herbalife's President's
7   Team distributors, an executive officer and/or director of Dream Builders and a close
8   associate of defendants Powell and Andry.  Juneja was actively involved in the
9   conception, formation and/or operation of the NWTW System as alleged herein.
10  During all times relevant hereto, Juneja had the ability to and did in fact, control,
11  conduct or participate in the affairs of Dream Builders and Herbalife.  Juneja
12  authorized the use of the NWTW System, the fraudulent business opportunity
13  complained of herein, made the misrepresentations alleged herein, and drafted and/or
14  adopted the fraudulent NWTW promotional materials discussed below.  The NWTW
15  promotional materials described below include "testimonials" by Juneja as to the
16  substantial earnings he had achieved which fraudulently suggested that other
17  participants could reasonably anticipate similar earnings. Juneja knew or with
18  deliberate recklessness disregarded material adverse facts which made the NWTW
19  promotional materials false and misleading, including but not limited to the facts that
20  Herbalife was a pyramid scheme and that few if any participants would be able to
21  achieve the levels of earnings portrayed in the materials and most would lose most or
22  all of their investments.  By virtue of his activities in promoting the NWTW System,
23  and drafting and disseminating the NWTW promotional materials, defendant Juneja is
24  a seller as to each and every member of the proposed Class.

25      25.    Defendant John Beall ("Beall") is one of Herbalife's top distributors, an
26  executive officer and/or director of Dream Builders and a close associate of defendant
27  Powell.  Beall was actively involved in the conception, formation and/or operation of
28  the NWTW System as alleged herein.  At all times relevant, Beall had the ability to
    and did in fact, control, conduct or participate in the affairs of Dream Builders and

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1   Herbalife. Beall authorized the use of the NWTW System, the fraudulent business

2   opportunity complained of herein, made the misrepresentations alleged herein, and

3   drafted and/or adopted the fraudulent NWTW promotional materials discussed below.

4   The NWTW promotional materials described below include "testimonials" by Beall

5   as to the substantial earnings he had achieved which fraudulently suggested that other

6   participants could reasonably anticipate similar earnings. Beall knew or with

7   deliberate recklessness disregarded material adverse facts which made the NWTW

8   promotional materials false and misleading, including but not limited to the facts that

9   Herbalife was a pyramid scheme and that few if any participants would be able to

10  achieve the levels of earnings portrayed in the materials and most would lose most or

11  all of their investments. By virtue of his activities in promoting the NWTW System,

12  and drafting and disseminating the NWTW promotional materials, defendant Beall is

13  a seller as to each and every member of the proposed Class.

14          26.    Defendant Brett Bartholomew ("Bartholomew") is one of Herbalife's top

15  distributors, an executive officer and/or director of Dream Builders and a close

16  associate of defendant Powell. Bartholomew was actively involved in the conception,

17  formation and/ or operation of the NWTW System as alleged herein. At all times

18  relevant, Bartholomew had the ability to and did in fact, control, conduct or

19  participate in the affairs of Dream Builders and Herbalife. Bartholomew authorized

20  the use of the NWTW System, the fraudulent business opportunity complained of

21  herein, made the misrepresentations alleged herein, and drafted and/or adopted the

22  fraudulent NWTW promotional materials discussed below. The NWTW promotional

23  materials described below include "testimonials" by Bartholomew as to the

24  substantial earnings he had achieved which fraudulently suggested that other

25  participants could reasonably anticipate similar earnings. Bartholomew knew or with

26  deliberate recklessness disregarded material adverse facts which made the NWTW

27  promotional materials false and misleading, including but not limited to the facts that

28  Herbalife was a pyramid scheme and that few if any participants would be able to

achieve the levels of earnings portrayed in the materials and most would lose most or

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1  all of their investments. By virtue of his activities in promoting the NWTW System,

2  and drafting and disseminating the NWTW promotional materials, defendant

3  Bartholomew is a seller as to each and every member of the proposed Class.

4       27.     Defendant Leah Singleton ("Singleton"), formerly sued herein as Leah

5  Graham, is one of Herbalife's top distributors, an executive officer and/or director of

6  Dream Builders and a close associate of defendant Powell. Singleton was actively

7  involved in the conception, formation and/or operation of the NWTW System as

8  alleged herein. At all times relevant, Singleton had the ability to and did in fact,

9  control, conduct or participate in the affairs of Dream Builders. Singleton authorized

10  the use of the NWTW System, the fraudulent business opportunity complained of

11  herein, made the misrepresentations alleged herein, and drafted and/or adopted the

12  fraudulent NWTW promotional materials discussed below. The NWTW promotional

13  materials described below include "testimonials" by Singleton (under the name Leah

14  Graham) as to the substantial earnings she had achieved which fraudulently suggested

15  that other participants could reasonably anticipate similar earnings. Singleton knew or

16  with deliberate recklessness disregarded material adverse facts which made the

17  NWTW promotional materials false and misleading, including but not limited to the

18  facts that Herbalife was a pyramid scheme and that few if any participants would be

19  able to achieve the levels of earnings portrayed in the materials and most would lose

20  most or all of their investments. By virtue of her activities in promoting the NWTW

21  System, and drafting and disseminating the NWTW promotional materials, defendant

22  Singleton is a seller as to each and every member of the proposed Class.

23       28.     Defendant Steven Combs ("S. Combs") is one of Herbalife's President's

24  Team distributors, and a close associate of defendant Powell. S. Combs was actively

25  involved in the conception, formation and/or operation of the NWTW System as

26  alleged herein. At all times relevant, S. Combs had the ability to and did in fact,

27  control, conduct or participate in the affairs of Dream Builders and Herbalife. S.

28  Combs authorized the use of the NWTW System, the fraudulent business opportunity

complained of herein, made the misrepresentations alleged herein, and drafted and/or

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1  adopted the fraudulent NWTW promotional material discussed below. The NWTW
2  promotional materials described below include "testimonials" by S. Combs as to the
3  substantial earnings he had achieved which fraudulently suggested that other
4  participants could reasonably anticipate similar earnings. S. Combs knew or with
5  deliberate recklessness disregarded material adverse facts which made the NWTW
6  promotional materials false and misleading, including but not limited to the facts that
7  Herbalife was a pyramid scheme and that few if any participants would be able to
8  achieve the levels of earnings portrayed in the materials and most would lose most or
9  all of their investments. By virtue of his activities in promoting the NWTW System,
10  and drafting and disseminating the NWTW promotional materials, defendant S.
11  Combs is a seller as to each and every member of the proposed Class.

12        29.    Defendant Debera Combs ("D. Combs") is one of Herbalife's President's
13  Team distributors, and a close associate of defendant Powell. D. Combs was actively
14  involved in the conception, formation and/or operation of the NWTW System as
15  alleged herein. At all times relevant, D. Combs had the ability to and did in fact,
16  control, conduct or participate in the affairs of Dream Builders and Herbalife. D.
17  Combs authorized the use of the NWTW System, the fraudulent business opportunity
18  complained of herein, made the misrepresentations alleged herein, and drafted and/or
19  adopted the fraudulent NWTW promotional materials discussed below. The NWTW
20  promotional materials described below include "testimonials" by D. Combs as to the
21  substantial earnings she had achieved which fraudulently suggested that other
22  participants could reasonably anticipate similar earnings. D. Combs knew or with
23  deliberate recklessness disregarded material adverse facts which made the NWTW
24  promotional materials false and misleading, including but not limited to the facts that
25  Herbalife was a pyramid scheme and that few if any participants would be able to
26  achieve the levels of earnings portrayed in the materials and most would lose most or
27  all of their investments. By virtue of her activities in promoting the NWTW System,
28  and drafting and disseminating the NWTW promotional materials, defendant D.
    Combs is a seller as to each and every member of the proposed Class.

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1    30.    Defendants Powell, Andry, C.M. Tsutakawa, Tsutakawa, Juneja, Beall,

2  Bartholomew, Singleton, S. Combs and D. Combs are sometimes collectively referred

3  to herein as the "Individual Defendants."

## FACTS COMMON TO ALL CAUSES OF ACTION

**Background of Herbalife**

31.    Herbalife began operations in 1980.  Herbalife is a multi-level or
"network" marketing company that sells a wide variety of weight management
products, nutritional supplements and personal care products throughout the United
States and in approximately 50 countries.  Defendant Herbalife International, Inc.
does business in its own behalf and through at least 47 domestic and foreign
subsidiaries, including defendant Herbalife International of America, Inc.  Herbalife
International, Inc.'s Form 10-K and Annual Report to Shareholders for the year
ending December 31, 2000 (the "Year 2000 10-K") reported retail sales for that year
in the amount of $1.764 billion.  The reported retail sales figures in the Year 2000 10-
K and Herbalife's other public filings were derived by assuming that 100% of the
products sold to Herbalife distributors were sold by them to consumers at 100% of
Herbalife's "suggested retail prices."  Herbalife acknowledges, however, that it does
not monitor the actual retail prices charged by distributors, and relies on distributor
certifications as to their retail sales.  Moreover, unknown quantities of Herbalife
products are consumed or stockpiled by Herbalife distributors, given away as
promotions, or sold at or below cost or at small mark-ups (including auctions on E-
bay), with the result that Herbalife's actual retail sales are much less than reported by
Herbalife.

32.    The Year 2000 10-K represents that Herbalife markets 179 products
under various trade names, including "thermojetics."  That document also discloses
that Herbalife creates and sells to distributors various marketing materials purportedly
to assist Herbalife distributors in marketing Herbalife products and recruiting new

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1   Herbalife distributors.  These marketing materials include written educational and
2   promotional documents, videotapes, audio cassette recordings and so-called
3   "distributor kits," the purchase of which is a prerequisite to obtaining an Herbalife
4   distributorship.

5       33.     The Year 2000 10-K represents that Herbalife's products are distributed
6   exclusively through a "network marketing system" consisting of over one million
7   distributors.

8       34.     The Herbalife network marketing system is jointly managed by
9   Herbalife's executive officers and a select group of distributors at the President's
10  Team level, including the Individual Defendants.  Herbalife's senior distributors,
11  including the Individual Defendants, are deeply and intimately involved in its sales,
12  training, motivation and strategic planning efforts.

13      35.     The management role of Herbalife's high level distributors is emphasized
14  in Herbalife's publicly filed documents.  For instance, Herbalife's February 5, 1997
15  Form S-3 (the "1997 Prospectus") states that "Mark Hughes and the Company's top
16  distributors ... are committed to training and motivating Herbalife's distributors."  The
17  1997 Prospectus reported that Herbalife's "most senior distributors consist of
18  approximately 260 distributors (as of December 31, 1996) who comprise the
19  President's Team and who work closely with Mark Hughes to develop and implement
20  new initiatives and strategies for increasing sales and distributor productivity
21  throughout the Company's entire distributor organization."

22      36.     This joint management of Herbalife's network marketing system
23  continued throughout the Class Period, including after the death of Mr. Hughes.  For
24  instance, Herbalife's Form 10-K Annual Report to Shareholders for the year ending
25  December 31, 2001 (the "Year 2001 10-K") states that "[m]embers of the President's
26  Team work closely with us to develop and implement new initiatives and strategies
27  for increasing sales and distributor productivity throughout our entire distributor
28  organization."

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

37.   In the Year 2001 10-K, Herbalife acknowledges that "some key supervisors who have attained the highest levels within our distributor network are responsible for generating a substantial portion of our sales and for recruiting a substantial number of our distributors."  In a letter dated November 30, 2001, William J. Halliday, Jr., an attorney for individual defendants Powell and Juneja, advised Herbalife that "T.J. [Juneja] and Anthony [Powell] believe that the purchases and sales made by the 10,000-12,000 Herbalife Distributors who are affiliated with NWTW represent somewhere between one-third and one-half of Herbalife's North American volume." (the "November 2001 Halliday letter").  Distributors whose downlines constitute such a large portion of a multi-level marketing firm's business have substantial influence and "clout," based in part on the implicit threat that if the Distributors terminated their association with the company, it would have a material adverse effect on the company's sales.  As the November 2001 Halliday letter goes on to say, "While they [Juneja and Powell] fully understand that this does not excuse any abuses which Herbalife believes are attributable to NWTW, it nevertheless does at least suggest that Herbalife on the one hand and T.J. and Anthony on the other hand should view their relationship as being reciprocal and should seek to accommodate each other as if they are on the same side rather than as if they are in opposition to each other. ...  There is a point beyond which T.J. and Anthony are unwilling to submit to the mandates of Herbalife because to do so would be detrimental to the growth of their Herbalife businesses."

**The Herbalife Sales and Marketing Plan**

38.   Herbalife pays its distributors pursuant to the "Herbalife Sales and Marketing Plan" (the "Herbalife Plan").  The entry level in the Herbalife Plan is the distributor level.  To become a distributor, a person must be "sponsored" by an existing distributor, and must purchase a "distributor kit."  Distributors are only entitled to purchase and sell Herbalife products.  A distributor who also wishes to sponsor other distributors and earn royalties and bonuses on the purchases of those

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 14

1  distributors must become a "Supervisor." In order to qualify as a Supervisor, a

2  distributor must purchase, from Herbalife or another distributor, Herbalife products

3  representing 4,000 volume points in one month, or 2,500 volume points in two

4  consecutive months. One "volume point" is equivalent to $1 (U.S.) at Herbalife's

5  suggested retail prices. A Supervisor must re-qualify once each year (by again

6  purchasing 4,000 volume points in one month or 2,500 volume points in two

7  consecutive months) in order to maintain her "Supervisor" status and continue

8  receiving royalties and bonuses.

9        39.    Supervisors who maintain their purchase requirements are paid "royalty

10  overrides" and various production bonuses on purchases of Herbalife products by

11  their "downline organizations." By meeting various volume and recruitment targets,

12  Supervisors can ascend in the Herbalife hierarchy from "World Team," "Global

13  Expansion Team," and "Millionaire Team" to "President's Team." The President's

14  Team includes an additional five levels, the highest being the "Chairman's Club," the

15  requirements for which include having at least five recruits who meet the volume

16  requirements for the President's Team. Distributors who reach the higher levels of

17  the Herbalife Plan and recruit large downline organizations can earn royalties and

18  bonuses far in excess of any retail profits they might earn by selling Herbalife

19  products to consumers. However, the number of distributors who reach the higher

20  levels is quite small. For example, in 1997 there were only 260 Herbalife President's

21  Team distributors out of a total of 115,000 Supervisors. In 1998 there were 397

22  President's Team distributors out of a total of 139,000 Supervisors.

23        40.    Herbalife does not disclose the average profits, earnings or sales of its

24  distributors, nor does it disclose the percentage of distributors who reach each level in

25  the Herbalife Plan. Instead, in its marketing and promotional materials, including on

26  its Internet web site, www.herbalife.com, Herbalife displays "testimonial" earnings

27  claims by successful distributors, including for example:

28        a.    Deborah and Hugh A.: "Deborah earns over $10,000 a month, and

she's aiming for President's Team;"

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

b.    Emily C.: "When you look at Emily C. she looks like a typical happy, healthy 22-year-old woman. But how many 22 year olds are earning $32,000 a month and heading up an international business? That's exactly what Emily is doing and she's not planning on stopping there, either."

c.    Jason F.: "Today, at age 22, Jason averages $18,000 a month!"

d.    Rox Anna C.: "We are earning on average $20,000 a month."

e.    Laura B.: "Laura currently earns $10,000 a month and has the freedom she's always wanted."

f.    Mandy and Bob E.: "Last month we made about $9,000, while enjoying a much better quality of life."

g.    Michael and Michelle B.: "Their monthly income currently totals approximately $11,000."

h.    Glenn W.: "On average, we earn approximately $20,000 plus a month."

i.    Ted F.: "I never would have imagined it, but now I make $7,000 a month."

j.    Nancy and Frank W.: "We earn approximately $15,000 a month working the business part time."

41.    Herbalife's web site also provides testimonial earnings claims by several of the Individual Defendants including S. Combs and D. Combs ("If someone would have told me five years ago that I would be earning US$22,000 per month, I would have said 'No way!' recalls Steve Combs, who with his wife Debbie are President's Team members."); Brett Bartolomew ("The Bartholomews have seen their check dramatically climb from $5,000 to $7,000 to $12,000 to $15,000. And now it's at more than $40,000 a month!"); Leah Singleton ("After only 4 weeks I made US$1,680 and quit my job. ... Now only five years later I am making US$45,000 a month."); and Doran Andry ("Within four months of working the business full time, I was making $10,000 a month, and by my seventh month the figure had jumped to $15,000.").

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 16

42.   The Federal Trade Commission and state agencies have found the practice of representing by implication, the use of hypothetical examples, or otherwise that distributors in multi-level marketing programs earn or achieve any stated amounts of profits, earnings or sales in excess of the average profits, earnings, or sales of all distributors, to be an "unfair or deceptive act or practice" in violation of law, unless the average profits, earnings or sales or the percent of all distributors who actually achieved such stated profits, earnings or sales is clearly and conspicuously disclosed. With its earnings testimonials, however, Herbalife merely provides a disclaimer, in small print, stating "The income testimonials presented are applicable to the individuals depicted and are not a guarantee of your income nor are they typical." These disclaimers are woefully inadequate to advise prospective distributors that their chance of achieving the incomes portrayed in the testimonials is vanishingly small.

**Herbalife Fails to Enforce Retail Sales Rules**

43.   The compensation structures of multi-level marketing companies like Herbalife lend themselves readily to the opportunity for abuse, to the extent that distributors are incentivized to focus their attention heavily on recruiting new distributors rather than on making retail sales of products.  Such abuses include encouraging distributors to purchase more products than they can feasibly sell to bona fide retail customers in order to meet volume requirements (a practice known as "inventory loading") and making deceptive earnings claims.  A multi-level sales organization in which the members obtain monetary benefits primarily from the recruitment of new members rather than selling goods to bona fide consumers is a pyramid scheme.  Pyramid schemes are inherently deceptive because most participants are doomed to failure.

44.   Herbalife's compensation structure, as set forth in the Herbalife Plan, is readily subject to these abuses.  The potential payout for distributors who sponsor large downline organizations far exceeds the "retail profits" a distributor could feasibly earn by simply retailing Herbalife products.  Accordingly, the Herbalife Plan

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1   incentivizes distributors to spend most of their time and energy in the recruitment of
2   new distributors as opposed to the retail sale of Herbalife products to consumers, with
3   the result that the Herbalife Plan constitutes a pyramid scheme.  In fact, Herbalife has
4   failed to properly monitor and police the Herbalife Plan and has failed to ensure that
5   most Herbalife products are actually retailed to bona fide consumers who are not
6   participants in Herbalife.

7       45.    In order to avoid being characterized as a pyramid scheme, Herbalife has
8   purported to adopt rules which require most of a distributor's product purchases to be
9   retailed to consumers ("Retail Sales Rules").  Among other things, the Retail Sales
10  Rules require distributors to certify that they have sold at least 70% of their prior
11  product purchases before making a new order and that they have made retail sales to
12  at least ten customers per month.  However, Herbalife has failed to adequately enforce
13  its Retail Sales Rules so as to ensure that the majority of its products are actually
14  retailed to bona fide consumers.

15      46.    There is no effective and enforceable requirement that Herbalife
16  distributors actually make retail sales of Herbalife products.  Ostensibly, Herbalife
17  requires distributors to "certify" that they have complied with the retail sales
18  requirements.  However, such "certification" is accomplished merely by clicking on a
19  box on an order form, and upline distributors, with Herbalife's knowledge, approval
20  and acquiescence, routinely instruct new participants that actual compliance with the
21  Retail Sales Rules is not necessary.

22      47.    While Herbalife supposedly requires all of its distributors to retail its
23  products, the Herbalife Defendants have failed to monitor and enforce these
24  requirements and have thereby permitted the Herbalife Plan, including the NWTW
25  System, to evolve into an unlawful pyramid scheme.

26      48.    The executive officers and directors of Herbalife have, and had at all
27  times relevant hereto, the obligation to monitor the promotional methods of its
28  distributors to insure that the Herbalife Plan would not become an unlawful pyramid
    scheme, and to insure that Herbalife distributors were not engaged in activities that

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 18

1   would foster and virtually insure the occurrence the abuses described above.

2   Further, Herbalife's executive officers and directors at all times relevant hereto were

3   obligated to sanction and/or immediately terminate the Herbalife distributorship of

4   any Herbalife distributor who conceived and formed marketing and promotional

5   strategies that fostered the abuses described above.

6       49.    There have been previous instances where Herbalife distributors

7   committed abuses of the Herbalife Plan. For instance, on March 6, 1985, the

8   California Attorney General filed a civil lawsuit against Herbalife, alleging inter alia

9   that Herbalife's Sales and Marketing Plan violated the California Endless Chain

10   Scheme law. Herbalife attributed the marketing plan allegations to "over

11   enthusiastic" distributors, but ultimately paid penalties of $850,000 and agreed to

12   develop a compliance department to monitor the activities of its distributors.

13   **DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS WERE MADE**

14   **WITH SCIENTER**

15       50.    In addition to the facts alleged above, the following facts demonstrate

16   that Defendants knew, or with deliberate recklessness disregarded, the material

17   adverse facts described in this Complaint.

18   **Background of Herbalife's Lead Generation Systems**

19

20       51.    Beginning in the late 1980's Herbalife began aggressively expanding

21   overseas. Herbalife's sales trend in new markets has been characterized by an initial

22   period of rapid growth, as new distributors are recruited, followed by a decline in

23   sales. In its public filings Herbalife explains these sales declines as due to adverse

24   publicity and increased regulatory scrutiny and other factors. In fact, the pattern of

25   initial rapid sales growth followed by sales decline accompanied by adverse publicity

26   and increased regulatory scrutiny is a fundamental characteristic of pyramid schemes.

27   The opening of a new market results in an initial wave of recruitment as new

28   distributors get caught up in the excitement of potentially earning large amounts of

royalties and bonuses. Most of these distributors are inevitably disappointed when the

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1 huge financial returns fail to materialize. By continuously opening new markets,
2 however, Herbalife was able to keep a sufficient number of Supervisors sufficiently
3 incentivized to keep sales increasing.

4     52. As set forth below, Herbalife has admitted that this continuous opening
5 of new markets was an essential component of its business strategy. Following this
6 strategy, from 1992 through 1996 Herbalife commenced operations in twenty-three
7 (23) new countries.

8     53. Herbalife's expansion strategy worked until approximately 1995, in that
9 while some markets declined after an initial period of explosive growth, these
10 declines were more than offset by sales increases in new markets, such that
11 Herbalife's total sales increased substantially every year. In addition, as Herbalife
12 expanded into new markets through 1995, its United States sales continued to
13 increase, such that the percentage of Herbalife's United States sales as compared to
14 total worldwide sales remained relatively constant, about 33% to 36%. However, in
15 1996 Herbalife's United States sales experienced a dramatic drop, both in absolute
16 terms and as a percentage of worldwide sales. Herbalife United States sales declined
17 from $333.6 million in 1995 (36.1% of worldwide sales) to $279.6 million in 1996
18 (23.3% of worldwide sales).

19     54. As stated in its February 5, 1997 Form S-3 and its March 30, 1999 Form
20 10-K, in 1996 Herbalife determined that it needed to develop new initiatives to
21 enhance sales in the U.S. market and other markets that had followed the trend of
22 initial rapid growth followed by sales declines. Such "sales revitalization" initiatives
23 were to include extensive training and motivational programs and the creation of new
24 "regional planning and strategy groups that include senior distributors."

25     55. One of Herbalife's new initiatives was to encourage and facilitate the
26 development by senior distributors of "Lead Generation Systems" ("LGS"). The term
27 "Lead Generation Systems" is used within Herbalife to refer to distributor-developed
28 promotional systems, the use of mass mailings, telephone solicitations, sign-posting,
sales scripts and other techniques designed to increase recruitment of new distributors.

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

56.     On the largest and most prominent ad Generation Systems in Herbalife was the "Newest Way to Wealth" program.

57.     Lead Generation Systems were ostensibly intended, as stated by Herbalife's then CEO, Francis X. Tirelli, in a letter to President's Team distributors, to take advantage of "21st Century communications vehicles" such as the Internet and computerized mailing and telephone systems.   In fact, however, the use of Lead Generation Systems was consciously intended by Herbalife and its senior distributors (a) to permit senior distributors to use more aggressive promotional materials and methods than those previously utilized and approved by Herbalife, (b) to provide Herbalife with a plausible defense (i.e., the "over zealous distributor" defense) in the event of regulatory problems with the distributor-generated promotional materials, and (c) to enable senior distributors to supplement their income through the sale of promotional materials to their downlines, and thereby provide an additional incentive for senior distributors to remain with Herbalife.

58.     In effect, Herbalife unleashed its senior distributors and expressly and tacitly directed and encouraged them to use deceptive and coercive techniques to recruit new distributors.  Herbalife tacitly agreed to refrain from enforcing its rules against using deceptive earnings claims and other misrepresentations to recruit new distributors, and to refrain from enforcing its Retail Sales Rules.  Moreover, at least in the case of the Newest Way to Wealth LGS, Herbalife participated in the conduct of the LGS through its ongoing consultations with the top distributors involved with NWTW, by giving prominent roles to the founders and leaders of NWTW (for example, by recognizing Anthony Powell at the May, 2001 Nashville extravaganza for having achieved the rank of President's Team in a company-wide record time of approximately one year, and by featuring Doran Andry on the cover of Herbalife's Business Today magazine which is circulated to all Herbalife distributors), by appearing at NWTW events (for instance, an October 2001 NWTW event in Las Vegas was attended by Herbalife's director of marketing), by adopting rules which permitted distributors to develop their own promotional materials, and by refraining

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1  from enforcing ⬤ requirement that such distributo⬤ eveloped promotional materials
2  comply with Herbalife's standards and be pre-approved by Herbalife's compliance
3  department.

4      59.    In a memorandum sent to President's Team members in mid to late 2001
5  (the exact date being unknown to plaintiffs), Frank Tirelli, Herbalife's CEO, asserted
6  that Lead Generation Systems were "[o]ne of our greatest opportunities [but] also one
7  of our greatest risks" (the "Tirelli Memo"). Tirelli characterized Lead Generation
8  Systems as one side of the "Golden Triangle of Success" (the other sides being
9  "products" and the "Home Office") and noted that he had been communicating this
10 message at every corporate and distributor event he had attended. Tirelli further
11 stated that "Herbalife is committed to take full advantage of all the collective
12 innovative and creative solutions in the marketplace with respect to Lead Generation
13 Systems." Tellingly, the Tirelli Memo warned that "LGS should be an augment to
14 the Herbalife mission and business and should not become more important
15 economically than the Herbalife opportunity."

16     60.    The Tirelli Memo was sent in 2001, in an effort to "close the barn door
17 after the horses were gone." By that time the Newest Way to Wealth and other LGS
18 had been in existence for several years, and indeed had constituted a key part of
19 Herbalife's business strategy to revitalize sales and the recruitment of new distributors
20 and Supervisors. For the first time, Herbalife, in the Tirelli Memo, adopted a series of
21 guidelines, effective January 1, 2002, governing the use of LGS. These guidelines
22 included review by Herbalife of every LGS to ensure compliance with legal
23 regulations, industry standards and Herbalife's own standards (although Tirelli
24 emphasized that he would be personally involved in all decisions and was committed
25 to the "innovative and creative use of LGS"); a requirement that at least 50% of every
26 LGS should be focused on Herbalife's products; an understanding that the purpose of
27 LGS was to "augment the Herbalife mission and business and should not become
28 more important economically than the Herbalife opportunity;" and a requirement that
   "all LGS should stay within the Chairman's Club lineage."

61.   The new guidelines were addressed to actual kinds of problems Herbalife was now forced to recognize that it had with LGS in general and with NWTW in particular.  When Tirelli referred to LGS as "one of our greatest risks" he was referring to the adverse impact of regulatory scrutiny and exposure to civil lawsuits which would likely be prompted due to the use of deceptive LGS promotional materials and the emphasis on recruiting new distributors over retail selling.  The admonition that at least 50% of a LGS should be devoted to extolling the merits of Herbalife's products is particularly telling, since the primary focus of Herbalife's LGS, including NWTW, was the recruitment of new distributors.  In fact, NWTW materials explicitly advised participants to spend at least 80% of their time and efforts in recruiting new distributors, and only 20% in retailing.  Moreover, in the case of NWTW, Tirelli's admonition that a LGS should not become "more important economically than the Herbalife opportunity" reflected an accomplished fact.

62.   Herbalife's LGS initiative in the United States had a significant impact on its financial performance.  In 1997, Herbalife's United States reported "retail" sales were $298.7 million, approximately 20% of Herbalife's total reported world-wide retail sales of $1,490.7 million.  As set forth in the following chart, the United States share of Herbalife's sales has increased every year since 1997, notwithstanding an absolute decline in sales in 2001:

Herbalife International, Inc.

U.S. Retail Sales vs. Worldwide Retail Sales

| Year | Total Worldwide Retail Sales (in millions) | U.S. Retail Sales (in millions) | U.S. Sales as a percentage of Total Retail Sales |
|------|--------------------------------------------|----------------------------------|--------------------------------------------------|
| 1993 | 693.1 | 247.0 | 35.6% |
| 1994 | 884.0 | 295.0 | 33.4% |
| 1995 | 923.6 | 333.6 | 36.1% |

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

| 1996 | 1,200.1 | 279.6 | 23.3% |
| 1997 | 1,490.7 | 298.7 | 20% |
| 1998 | 1,644.8 | 364.5 | 22.2% |
| 1999 | 1,793.5 | 416.1 | 23.2% |
| 2000 | 1,764.9 | 453.0 | 25.7% |
| 2001 | 1,656.2 | 441.7 | 26.7% |

63.     In addition, Herbalife's LGS initiative has resulted in the decrease in sales of "official" Herbalife corporate promotional literature, presumably due to the increasing sales of distributor-generated LGS promotional literature (which is not publicly reported).  As demonstrated in the following chart, prior to the commencement of the LGS initiative in 1997, Herbalife's sales of promotional literature had averaged approximately 5% of total reported retail sales.  Since then such sales have declined every year, both in absolute terms and as a percentage of total reported retail sales:

Herbalife International, Inc.

Sales of Promotional Literature

| Year | "Retail Sales" (in millions)** | Sales of Literature, Promotional and Other (in millions) | Promotional Literature as a percentage of total Retail Sales | |
|------|-------------------------------|----------------------------------------------------------|--------------------------------------------------------------|---|
| 1994 | 884.0 | 49.2 | 5.6% | |
| 1995 | 923.6 | 35.3 | 3.8% | |
| 1996 | 1,200.1 | 60.4 | 5.0% | |
| 1997 | 1,490.7 | 69.4 | 4.6% | |

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

| 1998 | 1,644.8 | 67.9 | 4.1% | |
| 1999 | 1,793.5 | 46.6 | 2.6% | |
| 2000 | 1,764.9 | 50.8 | 2.8% | |
| 2001 | 1,656.2 | 25.0 | 1.5% | |

**        Based on the numbers set forth in this chart, plaintiffs believe that Herbalife's senior distributors are earning tens of millions of dollars in the sale of LGS promotional materials, principally the sale of NWTW materials.

64.    Herbalife's LGS initiative, with its emphasis on recruiting more distributors, has also resulted in an increasing percentage of Herbalife's sales being comprised of purchases by Supervisors who are meeting their initial and/or annual qualifying purchase requirements.  As set forth above in paragraph 38, in order to rise to the rank of Supervisor, a distributor must initially qualify by purchasing 4,000 points worth of Herbalife products in one month, or 2,500 points worth of Herbalife products in two consecutive months, and a Supervisor must requalify every year in order to maintain his or her Supervisor status.  Since the inception of Herbalife's LGS initiative in 1997, the percentage of Herbalife's reported "retail" sales which can be accounted for by Supervisors meeting their qualifying purchase requirements has increased from 32.4% of total sales to no less than 40.5%, as set forth in the following chart:

Herbalife International, Inc. Total Retail Sales*

Compared to Minimum Qualifying Purchases by Supervisors

| Year | Supervisors | Minimum qualifying purchases by Supervisors | "Retail" Sales (less promo literature) (in millions)** | Percentage of Retail Sales by qualifying Supervisors | |
|---|---|---|---|---|---|

Page 25

| | | | (in millions)* | | | |
|---|---|---|---|---|---|---|
| | 1997 | 115,000 | 460 | 1,421.3 | 32.4% | |
| | 1998 | 139,000 | 556 | 1,576.9 | 35.3% | |
| | 1999 | 147,000 | 588 | 1,746.9 | 33.7% | |
| | 2000 | 160,000 | 640 | 1,714.1 | 37.3% | |
| | 2001 | 165,000 | 660 | 1,631.2 | 40.5% | |

\*      To become a Herbalife Supervisor, the distributor must purchase at least 4,000 "points" (approximately equivalent to the suggested retail price, i.e., 1 point equals $1) worth of Herbalife products in one month, or 2,500 points in two consecutive months.  The figures in this column are derived by multiplying the number of Supervisors in a given year by 4,000.  Accordingly, the minimum qualifying sales are understated, since some Supervisors qualify by purchasing a total of 5,000 points over two months.

\*\*      Herbalife reports "retail sales" based on the suggested retail sale prices reflected on its invoices to its distributors.  Herbalife does not monitor or collect information from its distributors concerning actual retail sales and does not know how much of the products sold to distributors are actually retailed or at what prices such products are retailed.

As noted above, the November 2001 Halliday letter estimates that the 10,000-12,000 Herbalife Distributors who were affiliated with NWTW represented between one-third to one-half of Herbalife's North American volume; Halliday's estimate is consistent with the allegations contained in this paragraph.

65.      The emphasis on recruitment is also demonstrated in that while Herbalife's sales have been decreasing for the past two years (and the rate of sales growth was increasing for years before that), the number of Supervisors has continued to increase, as set forth in the following chart:

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 26

Herbalife International, Inc.

Year-to-year Growth in Number of Supervisors and Retail Sales

| Year | Supervisors | Increase over previous year | "Retail" Sales (in millions)** | Increase (decrease) over previous year | |
|------|-------------|-----------------------------|-------------------------------|----------------------------------------|--|
| 1991 | 12,000 | | 191.0 | | |
| 1992 | 18,000 | 50% | 405.1 | 112.1% | |
| 1993 | 41,000 | 127.8% | 693.0 | 71.1% | |
| 1994 | 75,000 | 82.9% | 884.0 | 27.6% | |
| 1995 | 90,000 | 20% | 923.6 | 4.5% | |
| 1996 | 99,000 | 10% | 1,200.01 | 29.9% | |
| 1997 | 115,000 | 16.2% | 1,490.7 | 24.2% | |
| 1998 | 139,000 | 20.9% | 1,644.8 | 10.3% | |
| 1999 | 147,000 | 5.8% | 1,793.5 | 9.0% | |
| 2000 | 160,000 | 8.8% | 1,764.9 | (1.6%) | |
| 2001 | 165,000 | 3.1% | 1,656.2 | (6.2%) | |

**      Herbalife reports "retail sales" based on the suggested retail sale prices reflected on its invoices to its distributors.  Herbalife does not monitor or collect information from its distributors concerning actual retail sales and does not know how much of the products it sells to distributors are actually retailed or at what prices.

66.     In sum, the development of Lead Generation Systems such as the Newest Way to Wealth was a central part of Herbalife's business strategy to revitalize sales in the United States market, was consciously developed, implemented and intended by Herbalife and its distributors to encourage the use of deceptive earnings claims and other misrepresentations to promote increased recruitment of distributors and

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Supervisors, and is implemented in a manner intended to permit Herbalife to
disclaim responsibility for the acts of its distributors (including their failure to adhere
to the Retail Sales Rules), whom it characterizes as independent contractors.

**The Newest Way to Wealth ("NWTW") Scheme**

67.     On or before December 1999, pursuant to Herbalife's Lead Generation
System initiative, defendants Dream Builders, H.B. International Group, Inc.,
individual defendants Powell, Andry, Juneja, Beall, Bartholomew and Singleton and
other distributors not known to Plaintiffs, conceived, developed and implemented a
Lead Generation System dubbed "The Newest Way to Wealth" ("NWTW") to be
employed exclusively in the promotion of Herbalife (<u>i.e.</u> the NWTW System).

68.     Ostensibly, the NWTW System is an Internet-based mail order system
designed to assist Herbalife distributors to:

a.     Recruit customers and potential new Herbalife distributors (<u>i.e.</u>
"Lead Generation");

b.     Select "serious people out of th[e] leads without...having to see or
even speak to them"; and

c.     Train and follow-up with those serious leads.

69.     In fact, the NWTW System is a fraudulent scheme designed to exhort
Herbalife distributors to instantly achieve "Supervisor" status under the Herbalife
compensation structure by making a qualifying purchase of Herbalife products, to
focus most of their efforts on recruiting new distributors, and to ignore retailing.  The
NWTW scheme benefits Herbalife because the qualifying purchases of Herbalife
products necessary to reach the Supervisor level generate substantial sales for
Herbalife.  The NWTW scheme benefits the Individual Defendants because the
qualifying purchases by new Supervisors result in additional royalty and bonus
income for them, and it benefits Dream Builders and H.B International because they
realize additional profits from the sale of substantial amounts of NWTW promotional
materials.  The actual operation of the NWTW System in conjunction with the

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Herbalife Plan is pyramid sales scheme, where rewards are paid in connection with recruitment of new participants and the purchase of Herbalife products and NWTW promotional materials, rather than the sale of Herbalife products to bona fide consumers.

70.     During at least a portion of the Class Period, the NWTW System provided a bonus to participants who successfully recruited a new Herbalife Distributor who met the purchase requirements for the Supervisor level and also purchased a "Gold" or "Platinum" NWTW package.  This feature alone rendered the combination of the NWTW System and the Herbalife Plan a pyramid scheme and the sale of an investment contract.

71.     It was part of the NWTW scheme to cause distributors to disseminate uniform and standardized promotional materials which fraudulently projected the successful expansion and operation of the Herbalife businesses of NWTW members. For example, NWTW materials state that:

*       By using our powerful [NWTW] system, you will dramatically accelerate the growth of your Herbalife business.

*       If you follow [our] instructions...your business will be up and running in just a few days.  Follow all of the steps exactly.

*       If you follow all the steps and work with us, [you're] going to be just as successful as the people you've already read about.

72.     It was part of the NWTW scheme for participants to disseminate the NWTW promotional materials through the use of the mails and to follow up the mailings with telephone calls, following detailed sales scripts.  The NWTW System called for two mailings, a "First Package" and a "Second Package," each of which was to be followed up with a scripted telephone call.

73.     It was also part of the NWTW scheme, through the use of the uniform and standardized promotional materials, to exhort NWTW members to become Supervisors under the Herbalife Plan by making the minimum qualifying purchase, and to make substantial purchases of NWTW promotional materials.  NWTW

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1    promotional materials were sold in various packages ("Gold," "Silver" and

2    "Platinum") and participants were told that a significant portion of their earnings

3    would be derived from the sale of packages of promotional materials to their recruits.

4    NWTW also provided participants with preselected Herbalife product orders,

5    designed to meet the Supervisor purchase qualifications. The NWTW System also

6    involved efforts to keep new recruits motivated for as long as possible, despite the

7    failure of the system to live up to the expectations created by the promotional

8    materials, so as to increase their purchases of Herbalife products and NWTW

9    promotional materials. These efforts included "focus group" conference calls and the

10   extensive use of Herbalife's "touchfon" voice messaging system, both of which were

11   used to transmit additional training in recruitment techniques and motivational

12   messages intended to boost distributor morale.

13        74.    It was also part of the NWTW scheme to make fraudulent projections

14   concerning the earnings a new Herbalife distributor would or could reasonably expect

15   to earn. The NWTW promotional materials tout the so-called "20K" plan which

16   projects that a Herbalife distributor who makes a minimum investment in the NWTW

17   System will achieve "$20,000 in business every single month...within 30-90 days."

18   Further, these materials project that after 90 days the NWTW System would be "self-

19   funding." The NWTW Plan is entirely premised on the recruitment of new

20   distributors. NWTW distributors are instructed to spend at least 80% of their time on

21   the recruitment of new distributors. The NWTW materials represents that distributors

22   will not only receive bonuses from Herbalife based on product purchases by their

23   recruits, but that they will make profits on the sale of NWTW promotional materials

24   to their recruits, as well as a bonus directly from NWTW for each new recruit.

25        75.    The NWTW System calls for distributors to make wholesale purchases

26   of at least the minimum amount of products necessary to achieve and thereafter

27   maintain their status as Supervisors, regardless of whether the distributor is actually

28   making retail sales, a practice, known as "inventory loading". For example, the

projected earnings chart in the NWTW "Second Package" states that:

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

These examples will assume that everyone does just the MINIMUM of 2,500 Volume Points to be eligible to receive Royalties, and nothing more!  Production Bonuses are paid on infinite levels, [but] for these examples we are just considering our first three levels. [emphasis in original].

76.    NWTW System distributors are encouraged by Defendants to sponsor recruits with distributor kits, significant purchases of the NWTW System marketing tools and hundreds if not thousands of dollars of "wholesale" product purchases from Herbalife.  The NWTW System emphasizes through its uniform promotional materials the need to continue the on-going recruitment and sponsoring of new distributors into the NWTW System and the maintenance of personal wholesale product purchase volumes.  The common practice of NWTW System distributors is to meet much of their purchase volumes by selling products to other recruits, by using the products personally, and by inventory loading, rather than by retailing to the mythical "end consumer."

77.    All of the various techniques endorsed by the NWTW System to "retail" products are actually methods of "prospecting" for new distributors.  Retail selling is virtually non-existent and, in any event, secondary to recruitment.

78.    The NWTW promotional materials make numerous representations concerning the "incredible" incomes which participants can achieve if they buy in at the Herbalife Plan's "Supervisor" level and follow the NWTW System, including but not limited to the following:

a.    "The Second Package Video will show you how so many others are making incredible incomes with this opportunity.  Herbalife has created more millionaires than any other company in the history!  Currently, Herbalife has over 500 people on its prestigious President's Team who are earning between $200,000 per year and $5,000,000 per year! (Yes, you read the amount correctly - $5 Million Per Year).  In addition, there are thousands other [sic] people earning 6-figure income of

1 $100,000 per year or more.  These people come from various backgrounds and

2 ethnicity from welfare moms and 80-year-old grandmothers to teenagers and young

3 adults between the ages of 17 and 19."

4       b.    "Several of these people reached the $100,000 per year income

5 level within 1 year by using our [NWTW] incredible mail order and Internet

6 marketing program."

7       c.    "Your income at the [Herbalife] supervisor level is practically

8 UNLIMITED."

9       d.    "The supervisor position is undoubtedly the most advantageous

10 and lucrative position to start your business, however, if you are not able to start at

11 this level, please consult with your mentor to help you work your way to this level as

12 quickly as possible."

13       e.    "[Herbalife] distributors earn 30-50% more than almost any other

14 company's distributors assuming the same sales volume.  In fact, the company

15 [Herbalife's] compensation plan returns 73% OF THE TOTAL NET SALES to its

16 distributors.  That means that out of the $1.8 Billion in sales in 1998, $1.3 Billion was

17 paid out to us, the distributors!  That translates into incredible earning power for the

18 individual distributor."

19       f    Numerous "testimonial" earnings claims by the Individual

20 Defendants and others, including "Larry & SK Clark, TX: In their first 60 days earned

21 $2,500"; "John & Leslee Beall, IN: By my 11th month in business I was earning over

22 $10,000 per month ... still part-time"; "TJ Juneja, DC: Made over $7,000 per month

23 within 7 months of starting with this program [NWTW] and quit his full time job as a

24 CPA"; "Steve & Debbie Combs, CA: Less than five years ago our financial situation

25 was a disaster.  Thanks to this business opportunity we now have financial freedom

26 and a monthly income of more than $28,000"; "Leah Graham, WA: $30,000 check

27 last month"; and "Bret & Amber Bartholomew, NV: February's check *over *$60,000*

28 *just nine months using mail order!*" [emphasis in original].

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

g.     Other testimonials indicate that most if not all of these alleged earnings are based on recruitment bonuses and commissions, rather than retail sales.

79.     The NWTW Second Package includes a series of charts showing projected earnings for NWTW/Herbalife distributors, labeled "Five gets Five gets Five Plan," which represents potential earnings ranging from $19,375 to $42,625 monthly, "Four gets Four gets Four Plan," which represents potential earnings ranging from $10,500 to $23,100 monthly, and so on.

80.     The NWTW Second Package represents that the "Worst Case" is that the distributor will be earning $13,000 per month after 12 months following the program.

81.     Defendants Dream Builders, H.B. International Group, Inc. and the Individual Defendants sponsor promotional seminars and distribute promotional literature, video tapes and audio cassettes through which prospects are recruited and trained to join the NWTW System and to induce others to also join.  In the uniform and standardized promotional materials distributed in connection with the NWTW System, and at promotional events sponsored by Herbalife, H.B. International Group, Inc. and Dream Builders, NWTW members deliver "rags-to-riches" testimonials and claim extraordinary monthly incomes, exhorting the prospects to become Herbalife Supervisors and join the NWTW System.

82.     Defendants' representations as to the probabilities of success and their income projections were and are false.  Defendants' representations that the NWTW System is "self-funding" in less than 90 days were and are false.  Despite defendants' claims, there is in fact little chance that most individuals who purchase the NWTW System distributorships will even recoup their initial investment.

83.     In connection with the NWTW System, defendants have uniformly failed to disclose, in the First Package, the Second Package, the After First Package Call Back Script, the After Second Package Call Back Script, the "focus group" conference calls, the "touchfon" voice messages or otherwise, the following material facts:

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

a.    That investments of money and time in the Herbalife Plan and the NWTW System are exceedingly risky because the Herbalife Plan, including the NWTW System as employed in connection with the Herbalife Plan, constitutes a pyramid sales scheme, that such schemes inevitably collapse after a period of explosive growth, and most people in pyramid schemes lose money;

b.    That the Federal Trade Commission and state agencies have found the practice of representing by implication, the use of hypothetical examples, or otherwise that distributors in multi-level marketing programs earn or achieve any stated amounts of profits, earnings or sales in excess of the average profits, earnings, or sales of all distributors, to be an "unfair or deceptive act or practice" in violation of law, unless the average profits, earnings or sales or the percent of all distributors who actually achieved such stated profits, earnings or sales is clearly and conspicuously disclosed;

c.    That in order for plaintiffs and members of the Class to effectively evaluate the Herbalife Supervisor positions as business opportunities, each of the defendants should have disclosed the following information but failed to do so:

(1)    The actual bases for the earnings claims made in the NWTW promotional materials;

(2)    The number and percentages of Supervisors who actually achieved the earnings or ranges of earnings represented by the defendants, as well as the total number of distributors who acquired interests in each rank of the Herbalife Plan on an annual basis and by geographical area;

(3)    The number and percentages of distributors who reached each rank in the Herbalife Plan as compared to the total number of distributors who acquired interests in the Herbalife Plan on an annual basis and by geographical area;

(4)    The average income actually earned by distributors at each rank of the Herbalife Plan on an annual basis and by geographical area;

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

(5)     The average payments and expenses actually made and incurred by distributors at each rank of the Herbalife Plan on an annual basis and by geographical area;

(6)     The number and percentages of distributors at each level of the Herbalife Plan who voluntarily terminated or failed to renew their positions, who were terminated or refused renewal by Herbalife for any reason, who ceased to be "active", or who otherwise abandoned their positions in the Herbalife Plan on an annual basis and by geographical area; and

(7)     all other material information which could affect the decision of a reasonable businessperson; and

d.     That those NWTW distributors who have achieved the levels of incomes represented by defendants did so in large part because of the enormous revenues generated from the sales of NWTW promotional materials, revenues which are not generally available to victims of the NWTW promotional scheme.

84.     Herbalife and the NWTW defendants had a duty to disclose the aforementioned materials facts arising from (a) their roles as sellers of the Herbalife and Herbalife/NWTW securities, (b) the partial disclosures made in the NWTW promotional materials, and (c) the provisions of the California Seller Assisted Marketing Plan law, California Civil Code §1812.200, et seq.

85.     Herbalife and the NWTW defendants employ disclaimers in their contracts and promotional materials which state that "testimonial" or other representations as to possible earnings are not "guarantees" or "typical."  However, these disclaimers are totally inadequate.  Defendants knew and intended for prospective distributors and participants in Herbalife and the NWTW System to rely on these testimonial earnings claims as reasonable projections of possible earnings. Defendants had no reasonable basis for making these earnings claims and knew that it would be difficult or impossible for more than a small fraction of new distributors to achieve similar results.  For instance, while President's Team distributors may earn $20,000 per month or more, there are only a few hundred such distributors,

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1  representing less than 0.5% of all Supervisors and a minute percentage of Herbalife's
2  million-plus distributors, and a significant portion of such President's Team
3  distributors' "earnings" often are derived from the sales of promotional materials to
4  downline distributors.

5        86.    In short, the NWTW System is characterized by misrepresentations and
6  omissions of material fact. Information provided in video and audio-cassette tapes
7  and written promotional materials combine to give investors the materially incorrect
8  impression that their investments will be easily recouped, that the promotional
9  campaigns used in the NWTW System will generate new prospects, that distributors
10  will profit from their initial investment with little or no risk, and that the NWTW
11  System will be "self-funding" within 90 days. In fact, only a handful of distributors
12  have achieved the extraordinary levels of income represented by defendants, with
13  most losing their entire initial investment. Persons who attempt to participate in the
14  NWTW/Herbalife program typically invest from $4,000 to $50,000 or more in
15  purchases of Herbalife products and NWTW promotional materials, lose all or most
16  of their investment, and suffer other damages. A number of them have been forced
17  into personal bankruptcy. Defendants are continuing to promote, approve and/or
18  operate the fraudulent NWTW/Herbalife pyramid or endless chain scheme in the State
19  of California and throughout the United States, including its illegal pyramid scheme
20  aspect. These continuing activities further threaten the investments of the Class and
21  will victimize thousands of additional persons unless defendants are restrained and
22  enjoined. Defendants' activities have inflicted, and will continue to inflict, irreparable
23  harm upon the plaintiffs, the Class members, and prospective Herbalife distributors
24  who employ the NWTW System.

25        87.    As a result of and in reliance upon the uniform and standardized
26  representations and omissions of each of the defendants, the plaintiffs and other
27  NWTW/Herbalife distributors at all levels have become unknowing victims of the
28  NWTW scheme.

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

**Herbalife's Knowledge, Approval and Control Over the NWTW System**

88.   As alleged above, Herbalife jointly manages the Herbalife network marketing system with its elite group of President's Club distributors.  Herbalife conceived of and adopted Lead Generation Systems, developed by its high level distributors, as a crucial part of its business strategy to revitalize sales following the substantial decline in U.S. sales in 1996.

89.   Many of the representations in the NWTW promotional materials were attributable to statements made and approved by Herbalife and its founder, Mark Hughes.  These include, for example, the advice to spend 80% of one's time recruiting and only 20% retailing. In addition, as alleged above, Herbalife uses deceptive "testimonial" earnings claims in its official corporate promotional materials, and encourages its distributors, including the NWTW Defendants, to do the same. The testimonial earnings claims used in the NWTW System are not materially different than the testimonial earnings claims used by Herbalife in its corporate promotional materials, including the www.herbalife.com web site.

90.   As alleged above, NWTW was the largest LGS in Herbalife's network marketing system.  Moreover, NWTW System was developed and operated by Doran Andry, a member of Herbalife's Chairman's Club, the highest level in the Herbalife Plan, as well as prominent President's Team members, including individual defendants Anthony Powell, Tarun Juneja, Stephen and Debera Combs, and Craig and Caroline Tsutakawa.

91.   Shortly after the NWTW System was conceived and implemented, Herbalife obtained, reviewed and authorized the dissemination and use of the uniform sales, marketing and promotional materials employed in connection with the NWTW System.

92.   At some time after the inception of the NWTW System in December, 1999 and prior to May of 2001 (the exact date is known to the Herbalife Defendants but not to the plaintiffs), Herbalife began noticing unusual levels of activity among

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1    certain Herbalife distributors, either in the form of unusually high levels of Herbalife

2    product purchases or unusually rapid promotions through the levels of the Herbalife

3    Plan, or both.  Herbalife's legal department conducted a number of interviews of these

4    Herbalife distributors, and determined that they were employing the NWTW

5    promotional system in connection with their Herbalife distributorships.

6         93.    In May, 2001, Herbalife held a sales and training session in Nashville,

7    Tennessee for its top distributors (the "Nashville Extravaganza").  The Nashville

8    Extravaganza was attended by defendants Powell and Juneja, among other individual

9    defendants, and by many "20-K Plan" members of the NWTW System.  Both the "20-

10    K Plan" members and defendant Powell prominently displayed NWTW System

11    "Campaign" buttons and banners.  At the Extravaganza, defendant Powell was

12    recognized for achieving his President's Team membership in the Herbalife business

13    in the company-wide record time of approximately one year.

14         94.    At or just prior to the Nashville Extravaganza, defendants Juneja and

15    Powell met with Herbalife to review the representations in the NWTW promotional

16    materials.  Among the representatives of Herbalife at this meeting were then Chief

17    Executive Officer of Herbalife, Christopher Pair, now resigned, and then Herbalife

18    director Tirelli.  This meeting did not result in any material change in the NWTW

19    promotional materials or system.

20         95.    In or about May of 2001, Herbalife's Senior Vice President and

21    Associate General Counsel, Susan Rule, met or spoke with defendant Juneja

22    concerning the NWTW System, including the payment of bonuses for recruitment not

23    related to retail sales.  This conversation is referenced in a letter dated June 7, 2001

24    from Halliday to Rule.  This meeting or conversation did not result in any material

25    change in the NWTW promotional materials or system.

26         96.    By letter dated September 12, 2001, Herbalife advised defendant Powell

27    that it was investigating NWTW, that Herbalife believed that NWTW was

28    "continuously violating Herbalife's Rules," including that NWTW was "engaged in

an income generation enterprise from the distribution of sales aids and materials," that

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1  NWTW emphasized recruitment and paid referral fees based on recruitment, instead
2  of retail sales, that NWTW required Supervisor level purchases in order to obtain
3  distributor materials, and other violations.  Notwithstanding these serious allegations
4  already known to Herbalife, there was no material change in the NWTW promotional
5  materials or system.

6      97.    On October 9, 2001 there was a meeting at Herbalife's office in Century
7  City, California, attended by Herbalife's Executive Vice President, Robert Sandler,
8  Herbalife's General Counsel, Susan Rule, Herbalife's Assistant Chief Counsel,
9  Marcus Torrano, defendants Powell and Juneja, and their attorney Mr. Halliday.  This
10  meeting was memorialized in a letter from Mr. Torrano to Mr. Halliday dated October
11  12, 2001.  According to Mr. Torranno, at the meeting Herbalife's representatives
12  stated that numerous practices by NWTW participants, including Mr. Powell, had
13  been "the ongoing subject of numerous consumer and state regulator complaints," and
14  that the complaints received by Herbalife included but were not limited to complaints
15  that NWTW did not provide appropriate refunds, that  the NWTW "materials and
16  business practices emphasize recruitment, rather than retail sales," that the earnings
17  testimonials in the NWTW promotional materials did "not comply with the law," that
18  NWTW had represented, falsely, that its bonus program (under which NWTW
19  participants were paid for recruiting new Herbalife distributors) had been approved by
20  Herbalife, and that NWTW had been "piggy backing" its meetings with official
21  Herbalife meetings.

22      98.    Even after this meeting, defendants Powell and Juneja refused to correct
23  many of the problems with the NWTW System noted by Herbalife, including non-
24  compliance with Herbalife's refund policies and NWTW's emphasis on recruitment.
25  This is memorialized in letters from Halliday to Torrano, dated October 17, 2001 and
26  November 29, 2001.  For example, Powell and Juneja were continuing to refuse to
27  give refunds for unused NWTW promotional materials, to teach the Herbalife or
28  NWTW "buy-back policy" at training meetings, or to require NWTW to buy back a
terminating distributor's unused products, and claimed that "no such policy has been

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1   enforced by Herbalife as to any other distributor organization." In addition, while
2   Herbalife had criticized the statement in the NWTW promotional materials that there
3   should be an 80% - 20% ratio between recruiting and retailing, defendants Juneja and
4   Powell maintained that Herbalife's founder, Mark Hughes, had himself "suggested
5   such a ratio at numerous training meetings," and that even a 50/50 balance would be
6   "totally unrealistic" and "detrimental to the growth of Herbalife." Juneja and Powell
7   refused to change their bonus program for recruiting, maintaining that it would
8   "confuse NWTW participants."

9          99.    Shortly after Tirelli became Herbalife's CEO in October 2001, he met
10  with Juneja, Powell, S.Combs and D. Combs and Herbalife's in house counsel to once
11  again discuss the NWTW promotional materials. This meeting did not result in any
12  material change in the NWTW promotional materials or system.

13         100.   As a result of Herbalife's internal investigation, the numerous consumer
14  and state regulator complaints, and the meetings with Juneja, Powell, S.Combs and
15  D.Combs, and correspondence with Juneja and Powell's attorney, Tirelli and other
16  director and executive officers of Herbalife had ample time to review the promotional
17  materials employed in the NWTW System, and to determine that they were
18  fraudulent, deceptive and violated Herbalife's own Rules and Regulations.

19         101.   It was not until shortly after the filing of this lawsuit, however, that
20  Herbalife finally took some action to enforce its rules and contractual requirements
21  regarding earnings claims and other misrepresentations. On March 1, 2002, Herbalife
22  suspended defendants Powell and Juneja for their role in the NWTW scheme, as set
23  forth in a letter delivered to Powell's and Juneja's attorney.

24         102.   On or about January 8, 2002, certain distributors of the NWTW System
25  participated in a conference call to voice their concerns about the NWTW System, the
26  financial losses that they had sustained because of the NWTW System, and the
27  possible use that they might make of a lead generation system other than the NWTW
28  System. During that call, defendant Powell, who had not been invited to participate,
    was connected to the conference call and announced that the participants' identities

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 40

1  were known to Herbalife, that their conduct in considering an alternate lead
2  generation system to the NWTW System would be dealt with severely by Herbalife,
3  and that Tirelli had been connected to the call and was monitoring the conversation of
4  the participants.

## FACTS REGARDING INDIVIDUAL AND REPRESENTATIVE PLAINTIFFS

7      103.  Relying on the fraudulent misrepresentations and omissions in the
8  NWTW promotional materials described above, plaintiff Nancy Jacobs was induced
9  to become an Herbalife distributor and a participant in the NWTW System on or
10  about August 27, 2001 and continuing thereafter.  On or about August 27, 2001 and
11  August 31, 2001, respectively, Jacobs made her initial investments in Herbalife and
12  NWTW.  The NWTW "First Package" was mailed to Jacobs at 2016 Manchester
13  Road, Wheaton, Illinois on or about August 27, 2001.  The NWTW "Second
14  Package" was mailed to Jacobs at 2016 Manchester Road, Wheaton, Illinois on or
15  about August 29, 2001. The Gold and Platinum product packages were mailed to
16  Jacobs at 2016 Manchester Road, Wheaton, Illinois on or about September 7, 2001.
17  Jacobs became a Herbalife distributor on or about September 7, 2001, a member of
18  NWTW on or about September 10, 2001, a NWTW focus group member on or about
19  September 26, 2001, and a Herbalife Supervisor prior to October 28, 2001.  Jacobs
20  participated in "focus group" conference calls, arranged by or at the direction of
21  Defendants and transmitted by interstate wires, on September 9, October 3, October 7,
22  October 18, October 21, October 25, November 1, November 8, November 11,
23  November 15 and November 25, 2001 and other dates.

24      104.  Plaintiff Jacobs committed herself on a full time basis to the NWTW
25  System.  She purchased significant quantities of Herbalife products and NWTW
26  promotional materials at various times throughout the Class Period, including a "Gold
27  Package" and a "Platinum Package," and paid to attend NWTW training sessions
28  including one held in Cleveland, Ohio on or about November 3, 2001.  Plaintiff
   continued her efforts to learn to use the NWTW System by listening to "at home"

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1 audio seminars offered over the telephone and Internet, logging on to "focus group"
2 conference calls, and by purchasing NWTW training tapes and compact disks.

3     105. After nearly three and one-half months of exhaustive work conducted in
4 accordance with the training materials she obtained from the NWTW System, Dream
5 Builders, Herbalife and the other defendants, Jacobs found herself without income
6 and nearly bankrupt. She also had an abundance of sales aids and products which she
7 was unable to dispose of at a fair sale or refund price.

8     106. Jacobs' efforts in operating her distributorship had no effect on her
9 success or failure in Herbalife. Rather, it was the essential managerial efforts of
10 Herbalife and the NWTW Defendants which determined the fate of her investment.
11 The primary factors causing her losses were her low position in the Herbalife
12 marketing chain and because Herbalife is a pyramid scheme in which most
13 participants are doomed to failure.

14     107. Once Jacobs recognized that the Herbalife Plan and the NWTW System
15 were fraudulent schemes, she withdrew from participation and sought the advice of
16 legal counsel.

17     108. Sanchez became a Herbalife distributor on or about March 30, 2000.
18 Sanchez was first solicited to invest in NWTW in or about January of 2001. As part
19 of that solicitation, Sanchez received a NWTW "After First Package Call Back
20 Script" in or about April of 2001, and a NWTW "Second Package" in or about April
21 of 2001, each by mail and sent out at the direction of the Tsutakawa defendants.
22 Relying on the fraudulent misrepresentations and omissions in the NWTW
23 promotional materials described above, Sanchez was induced to participate in the
24 NWTW System on or about April 23, 2001 and continuing thereafter.

25     109. Sanchez committed herself on a full time basis to the NWTW System.
26 During the Class Period she purchased significant quantities of Herbalife products,
27 attended NWTW training sessions, purchased NWTW promotional materials and
28 qualified to be and became an Herbalife Supervisor prior to July 1, 2001. Sanchez
continued her efforts to learn the NWTW System by listening to "at home" audio

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1 | seminars offered over the telephone and Internet, logging on to "focus group"

2 | conference calls, and by purchasing NWTW training tapes and compact discs.

3 |     110.   After several months of exhaustive work conducted in accordance with

4 | the NWTW promotional and training materials which she purchased, Sanchez was

5 | forced to declare personal bankruptcy.  She also had an abundance of sales aids and

6 | products which she was unable to dispose of at a fair sales or refund price.

7 |     111.   Sanchez' efforts in operating her distributorship had no effect on her

8 | success or failure in Herbalife.  Rather, it was the essential managerial efforts of

9 | Herbalife and the NWTW Defendants which determined the fate of her investment.

10 | The primary factors causing her losses were her low position in the Herbalife

11 | marketing chain and because Herbalife is a pyramid scheme in which most

12 | participants are doomed to failure.

13 |     112.   Once Sanchez recognized that the Herbalife Plan and the NWTW System

14 | were fraudulent schemes, she withdrew from participation and sought the advice of

15 | legal counsel.

16 |     113.   Thousands of additional individuals who invested in the Herbalife and

17 | NWTW/Herbalife Securities are now inactive and have sustained the loss of most or

18 | all of their investments and have sustained additional economic loss.

19

20 | ## THE ALLEGED SECURITIES

21 | **The Herbalife Securities**

22

23 |     114.   Investments in the Herbalife Plan as described in this Complaint at the

24 | Supervisor level or higher, including but not limited to the purchase of Herbalife

25 | products and sales aids, constitute investment contract securities under both the

Securities Act and the Exchange Act ("Herbalife Securities").

26 |     115.   Each purchase of Herbalife products and sales aids by plaintiffs and

27 | members of the Class constitutes a new investment in Herbalife Securities.

28

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

The Herbalife/NWTW Securities

116.    Investments in the combination of the Herbalife Plan and the Newest Way to Wealth Lead Generation System as described in this Complaint, including but not limited to purchases of NWTW promotional materials and Herbalife products, constitute investment contract securities for purposes of both the Securities Act and the Exchange Act ("Herbalife/NWTW Securities").

117.    Each purchase of Herbalife and NWTW products and sales aids by plaintiffs and members of the Class constitutes a new investment in Herbalife/NWTW Securities.

## FRAUDULENT CONCEALMENT

118.    The acts and practices of the defendants described herein were intended to and did fraudulently conceal the existence of and basis for the claims by plaintiffs and the Class.  These acts and practices include but are not limited to the deceptive earnings claims by the Herbalife Defendants and Individual Defendants described in Paragraphs 40 and 41, the deceptive earnings claims made in the NWTW promotional materials described in Paragraph 78, and the fraudulent omissions described in Paragraph 83, all of which were intended to and did create the materially false impression that Herbalife and NWTW were legitimate business opportunities and not unlawful pyramid schemes.

## THE NEED FOR INJUNCTIVE RELIEF

119.    Defendants are continuing to operate Herbalife as an unlawful pyramid scheme.  Herbalife has utterly failed to enforce the policies and procedures which were ostensibly designed to preclude the operation of the Herbalife Plan as an illegal pyramid scheme.  Defendants have demonstrated every inclination to continue defrauding current and prospective Herbalife distributors through the operation of the Herbalife Plan.  Although after the filing of the original Complaint in this action and

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1   in recognition of the inherently fraudulent nature of the NWTW System and
2   promotional materials, Herbalife took some steps to terminate the use of the NWTW
3   System and promotional materials, those steps have not completely eliminated the
4   circulation of the fraudulent NWTW materials.

5          a.     Herbalife purported to "suspend" individual defendants Powell
6   and Juneja on March 1, 2002. However, by letter dated June 4, 2002, Herbalife
7   notified Powell and Juneja that it was continuing to receive new complaints regarding
8   NWTW "on almost a daily basis," and that Powell and Juneja had failed to comply
9   with Herbalife's requests to modify the NWTW promotional materials, to provide
10  Herbalife with information concerning their business practices, or to comply with
11  Herbalife's "Rules and Regulations."

12         b.     In or about June 2002, members of the Herbalife Lead Generation
13  System known as the "Freedom Group" were advised by their upline distributors that
14  the Freedom Group and NWTW were going to combine their efforts. The Freedom
15  Group is continuing the use promotional techniques and materials similar to the
16  NWTW System described herein.

17         c.     Herbalife has recently entered into "reinstatement" agreements
18  with Powell (on November 26, 2002) and Juneja (on January 21, 2003), under which
19  Powell and Juneja agreed, inter alia, that NWTW had ceased operations.

20         d.     As recently as February 14, 2003, individual defendant Doran
21  Andry was still offering NWTW promotional materials for sale on the website
22  "www.becashhappy.com." Defendants Andry and Powell have converted their
23  downline NWTW recruits into members of the Financial Success System ("FSS")
24  LGS, starting in the fall of 2002 and continuing to this day. Plaintiffs are informed
25  and believe that the FFS is little more than the NWTW renamed and repackaged and
26  that the FFS continues to sell and offer for sale unregistered Herbalife securities.

27         e.     Herbalife is incapable of effectively policing its distributors,
28  especially the downlines represented by NWTW and the Individual Defendants,
    because the NWTW downlines account for such a large portion of Herbalife's sales

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Page 45

1  that Herbalife cannot take the risk of losing them.  Injunctive relief is essential in

2  order to prevent further injury to the Class and the general public.

## CLASS ACTION ALLEGATIONS

6      120.  Plaintiffs bring this Class Action on behalf of themselves, and on behalf

7  of all other persons similarly situated.  Plaintiffs request that this Court certify the

8  following Plaintiff Class, or appropriate subclasses thereof, initially defined as:

9      all residents of the United States who, at any time from February 19, 1998 to

10  the date the Class is certified in this action (the "Class Period"):

11          (a)    were Herbalife distributors at the Supervisor level or higher; and

12          (b)    purchased Herbalife products and/or NWTW promotional

13  materials for use with their Herbalife distributorship; and

14          (c)    incurred net economic loss as a result.

15  The Defendants, any entity in which any of them has a controlling interest, and their

16  legal representatives, heirs, and successors, are expressly excluded from membership

17  in the Class and any subclasses thereof.

18      121.  This action has been brought and may properly be maintained, pursuant

19  to the provisions of Fed. R. Civ. P. 23(a)(1) through (4), 23(b)(1), (2) and/or 23(b)(3);

20  and satisfies the numerosity, commonality, typicality, adequacy, impairment and

21  superiority requirements thereof, because:

22          (a)    The members of the Class are so numerous that their individual

23  joinder herein is impractical.  The Class is believed to number from 10,000 to 12,000

24  members.  Individual and Representative Plaintiff Jacobs invested and lost

25  approximately $9,700 in defendants' fraudulent pyramid scheme and suffered other

26  financial losses, and plaintiff Sanchez invested and lost approximately $24,500 and

27  suffered other financial losses.  The remaining aggregate out-of-pocket losses of the

28  Class are estimated to exceed $40 million.  If the Court determines notice to be

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1    necessary or appropriate, Class members may be notified of the pendency of this

2    action by mail, supplemented or substituted by published notice.

3                (b)    Common questions of law and fact exist as to all members of the

4    Class.  These questions predominate over any questions which affect only the

5    individual members of the Class. These common legal and factual questions include:

6                       (1)    Whether the Herbalife Plan is a pyramid scheme and

7    therefore an investment contract, as alleged in this Complaint;

8                       (2)    Whether Herbalife failed to register the Herbalife

9    distributorships in violation of Section 5 of the Securities Act;

10                      (3)    Whether Herbalife sold or offered to sell unregistered

11   securities to the plaintiffs and the Class;

12                      (4)    Whether the plaintiffs and the Class are entitled to recover

13   the consideration paid for the Herbalife Securities, pursuant to Section 12(a)(1) of the

14   Securities Act; and

15                      (5)    Whether the Herbalife Plan is an Endless Chain Scheme for

16   purposes of California Penal Code Section 327.

17                      (6)    Whether the combination of the Herbalife Plan and the

18   NWTW System is a pyramid scheme and therefore an investment contract, as alleged

19   in this Complaint;

20                      (7)    Whether defendants sold or offered to sell the

21   Herbalife/NWTW securities to plaintiffs and members of the Class;

22                      (8)    Whether the NWTW promotional materials described in the

23   Complaint constitute a "prospectus" as defined in Section 2 of the Securities Act, and

24   whether the Herbalife/NWTW Securities were sold pursuant to a public offering;

25                      (9)    Whether the NWTW promotional materials contain untrue

26   statements of material fact or omit to state material facts necessary to make them not

27   misleading;

28                      (10)   The proper measure of damages for defendants' violations

     of Sections 12(1) and 12(2) of the Securities Act;

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1    11)    Whether defendants violated Section 10b of the Exchange

2    Act and Rule 10b(5) promulgated thereunder by promoting the Herbalife securities

3    through the use of the fraudulent NWTW and Herbalife promotional materials;

4    (12)    Whether the combination of the NWTW System and the

5    Herbalife Plan results in an Endless Chain scheme in violation of California Penal

6    Code 327;

7    (13)    Whether the combination of the NWTW System and the

8    Herbalife Plan constitutes a Seller Assisted Marketing Plan pursuant to California

9    Civil Code §1812.201;

10   (14)    Whether the NWTW promotional documents and materials,

11   including video presentations and audio tapes, prepared and disseminated by

12   defendants to the Class misrepresented or omitted material facts about the benefits,

13   prospects, interrelationships, financial condition, activities of, and the safety, security,

14   and economic benefits of the business opportunities offered by defendants;

15   (15)    Whether the NWTW documents and materials, audio tapes

16   and video presentations misrepresented material facts relative to the true value of

17   Herbalife's distributorships and the economic benefits which could be obtained by

18   serving as one of Herbalife's Supervisors;

19   (16)    Whether the defendants were aware of and misrepresented

20   or omitted material facts relative to the true value of Herbalife's business

21   opportunities, and the economic benefits which could be obtained by serving as one of

22   Herbalife's Supervisors; and

23   (17)    Whether the defendants acted with the requisite degree of

24   scienter in omitting to state and/or misrepresenting material facts with respect to the

25   foregoing, or in controlling such misstatements.

26   (c) Plaintiffs' claims are typical of those of the proposed Class, since

27   plaintiffs made investments similar to those of the Class, and the proposed Class is

28   defined to include all persons and entities (except defendants and affiliates and

insiders as set forth above) who made such investments.  Furthermore, plaintiffs and

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1    all members of the Class have sustained monetary damages arising out of defendants'

2    violations of the securities laws and California law as alleged herein.

3              (d)    Plaintiffs will fairly and adequately protect the interests of the

4    members of the Class.  Both Jacobs and Sanchez are members of the Class.  Neither

5    have interests which are adverse to the interests of the Class members.  Plaintiff

6    Jacobs invested and lost approximately $9,700 in defendants' pyramid scheme and

7    suffered other financial losses.  Plaintiff Sanchez invested and lost approximately

8    $24,500 and suffered other financial losses.  These losses provide them with

9    substantial stakes in this action and the incentive to prosecute it vigorously for

10   themselves and for the Class.  Plaintiffs have retained counsel competent and

11   experienced in class actions, securities law, franchising and distribution law,

12   consumer protection law and complex litigation, and intend to pursue this action

13   vigorously.

14             (e)    A class action is superior to other available methods for the fair

15   and efficient adjudication of the litigation since individual joinder of all Class

16   members is impracticable.  Although the damages suffered by each individual Class

17   member may total thousands or even tens of thousands of dollars, damages of such

18   magnitude are nonetheless relatively small given the expense and burden of individual

19   prosecution of the complex and extensive litigation necessitated by the fraudulent

20   promotion of a business opportunity or illegal pyramid scheme.  Thus, it would be

21   virtually impossible for the Class members to individually redress the wrongs done to

22   them.  Even if the Class members themselves could afford such individual litigation,

23   the Court system could not.  Individualized litigation presents the potential for

24   inconsistent or contradictory judgments.  Individualized litigation magnifies the delay

25   and expense to all parties, and to the court system, presented by the complex legal and

26   factual issues of the case.  By contrast, a class action presents far fewer management

27   difficulties, and provides the benefits of unitary adjudication, economy of scale, and

28   comprehensive supervision by a single court.

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

(f)    The foregoing allegations demonstrate satisfaction of the basic certification criteria of Fed. R. Civ. P. 23(a)(1)-(4) and 23(b)(3) and the requirements for voluntary, or opt-out certification under Fed. R. Civ. P. 23(c)(2).  The circumstances of this litigation may likewise justify the certification of the proposed Class on a mandatory (non-opt out) basis under Fed. R. Civ. P. 23(b)(1)(A) and/or (B), because the prosecution of separate actions by the members of the proposed Class would create a risk of (A) inconsistent or varying adjudication with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Classes; or (B) adjudication with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not party to the adjudications, or substantially impair or impede their ability to protect their interests.

(g)    In conducting the unlawful pyramid scheme alleged herein and by omitting and concealing material facts regarding the scheme from prospective distributors, defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole, and making appropriate class certification under Fed. R. Civ. P. 23(b)(2).

## CLAIMS FOR RELIEF

### COUNT I

**(Against All Defendants for Violation of Section 12(1) of the Securities Act)**

122.   Plaintiffs repeat each allegation contained in the preceding paragraphs, as if fully set forth herein, except that plaintiffs specifically disclaim any intent to prove fraud or scienter as to this Count.  This Count is asserted against all defendants pursuant to Section 12(1) of the Securities Act, 15 U.S.C. §77l(a)(1), on behalf of Plaintiffs and all members of the Class who purchased any Herbalife Securities and/or Herbalife/NWTW Securities on or after February 19, 2001.

1  123.   The Herbalife Securities and Herbalife/NWTW Securities were not

2  registered pursuant to Section 6 of the Securities Act, 15 U.S.C. §77f.

3  124.   Defendants sold or solicited the sale of the unregistered Herbalife

4  Securities and Herbalife/NWTW Securities to plaintiffs and members of the Class, by

5  means of interstate commerce or the mails, in violation of Section 5(a) of the

6  Securities Act, 15 U.S.C. §77e(a).

7  125.   Plaintiffs and the Class hereby tender their Herbalife Securities and

8  Herbalife/NWTW Securities and are entitled to recover the consideration paid for the

9  Herbalife Securities and the Herbalife/NWTW Securities plus interest, or damages if

10  they have sold the securities, pursuant to Section 12(1) of the Securities Act.

11  **COUNT II**

12

13  **(Against All Defendants for Violation of Section 12(2) of the Securities Act)**

14  126.   Plaintiffs repeat each allegation contained in the preceding paragraphs, as

15  if fully set forth herein. This Count is asserted against all Defendants pursuant to

16  Section 12(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of Plaintiffs and

17  all members of the Class who purchased any Herbalife/NWTW Securities on or after

18  February 19, 1999.

19  127.   The NWTW promotional materials as described in this Complaint

20  constitute a prospectus as defined in Section 2(a)(10) of the Securities Act, 15 U.S.C.

21  §77b(a)(10).

22  128.   The NWTW promotional materials were materially false and misleading;

23  contained untrue statements of material facts; omitted to state facts necessary to make

24  the statements made therein, under the circumstances in which they were made, not

25  misleading; and failed to adequately disclose material facts. As detailed herein, the

26  NWTW promotional materials included earnings claims and projections for which

27  defendants had no reasonable basis for belief, and omitted material facts, including

28  but not limited to the following:

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

a.     That investments of money and time in the Herbalife Plan and the NWTW System are exceedingly risky because the Herbalife Plan, including the NWTW System as employed in connection with the Herbalife Plan, constitutes a pyramid sales scheme, that such schemes inevitably collapse after a period of explosive growth, and most people in pyramid schemes lose money;

b.     That the Federal Trade Commission and state agencies have found the practice of representing by implication, the use of hypothetical examples, or otherwise that distributors in multi-level marketing programs earn or achieve any stated amounts of profits, earnings or sales in excess of the average profits, earnings, or sales of all distributors, to be an "unfair or deceptive act or practice" in violation of law, unless the average profits, earnings or sales or the percent of all distributors who actually achieved such stated profits, earnings or sales is clearly and conspicuously disclosed;

c.     That in order for plaintiffs and members of the Class to effectively evaluate the Herbalife Supervisor positions as business opportunities, each of the defendants should have disclosed the following information but failed to do so:

(1)     The actual bases for the earnings claims made in the NWTW promotional materials;

(2)     The number and percentages of Supervisors who actually achieved the earnings or ranges of earnings represented by defendants, as well as the total number of distributors who acquired interests in each rank of the Herbalife Plan on an annual basis and by geographical area;

(3)     The number and percentages of distributors who reached each rank in the Herbalife Plan as compared to the total number of distributors who acquired interests in the Herbalife Plan on an annual basis and by geographical area;

(4)     The average income actually earned by distributors at each rank of the Herbalife Plan on an annual basis and by geographical area;

1   (5)   The average payments and expenses actually made and
2   incurred by distributors at each rank of the Herbalife Plan on an annual basis and by
3   geographical area;

4   (6)   The number and percentages of distributors at each level of
5   the Herbalife Plan who voluntarily terminated or failed to renew their positions, who
6   were terminated or refused renewal by Herbalife for any reason, who ceased to be
7   "active", or who otherwise abandoned their positions in the Herbalife Plan on an
8   annual basis and by geographical area; and

9   (7)   all other material information which could affect the
10   decision of a reasonable businessperson; and

11   d.   That those NWTW distributors who have achieved the levels of
12   incomes represented by defendants did so in large part because of the enormous
13   revenues generated from the sales of NWTW promotional materials, revenues which
14   are not generally available to victims of the NWTW promotional scheme.

15   129.   Defendants were responsible for the contents of the NWTW promotional
16   materials and caused them to be circulated to the public, including plaintiffs and
17   members of the Class.

18   130.   The dissemination of the NWTW promotional materials by the
19   defendants was a public offering, in that (a) tens of thousands of copies of the NWTW
20   promotional materials were distributed nationwide; (b) the NWTW promotional
21   materials were targeted to unsophisticated investors; and (c) the manner of
22   distribution included widespread sign posting, mass mailings and e-mailings,
23   automated telephone calls, and hundreds of Internet web sites.

24   131.   None of the defendants made a reasonable investigation or possessed
25   reasonable grounds for belief that the statements described above, which were
26   contained in the NWTW promotional materials, were true, were without omission of
27   any material facts, and were not misleading.  The misstatements and omissions
28   alleged above occurred as a result of the negligence of the defendants.

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

132.   Defendants are liable for their preparation and/or distribution of the NWTW promotional materials to the plaintiffs and members of the Class.

133.   Neither the plaintiffs nor any member of the Class knew of the facts concerning the inaccurate and misleading statements and omissions alleged herein.

134.   In connection with the dissemination of the NWTW promotional materials, the defendants, directly or indirectly, each used the means and instrumentalities of interstate commerce and the U.S. mails.

135.   This action was brought within one year after the discovery of the untrue statements and omissions alleged herein.

## COUNT III

### (Against Herbalife Pursuant to Section 15 of the Securities Act for Violation of Section 12(2) of the Securities Act)

136.   Plaintiffs repeat each allegation contained in the preceding paragraphs, as if fully set forth herein.  This Count is asserted against the Herbalife Defendants pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, for controlling person liability arising from violations of Section 12(2) of the Securities Act, 15 U.S.C. §77l(a)(2), by the NWTW Defendants, on behalf of Plaintiffs and all members of the Class who purchased any Herbalife/NWTW Securities on or after February 19, 1999.

137.   At the time the NWTW promotional materials were disseminated by the NWTW Defendants, the Herbalife Defendants were controlling persons of each of the NWTW Defendants by reason of (a) the Herbalife Defendants' contractual control and influence over each of the Individual Defendants pursuant to their Herbalife distributor agreements; (b) the Herbalife Defendants' right to enforce the Herbalife rules and regulations incorporated by reference in the Herbalife distributor agreements, as demonstrated by Herbalife's suspension of individual defendants Powell and Juneja shortly after the filing of this action; (c) the joint management of the Herbalife network marketing system by Herbalife and the Individual Defendants and other top level Herbalife distributors; and (d) the role of the Individual

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1  Defendants, and their controlled corporations, Dream Builders and H.B. International

2  Group, Inc., in executing Herbalife's corporate strategy to develop Lead Generation

3  Systems like NWTW.  Herbalife actively exercised its control over the business and

4  affairs of the NWTW Defendants.

5      138.  None of the Herbalife Defendants made a reasonable investigation or

6  possessed reasonable grounds for belief that the statements described above, which

7  were contained in the NWTW promotional materials, were true, were without

8  omission of any material facts, and were not misleading.  Therefore, by reason of their

9  positions of control over the NWTW Defendants, each of the Herbalife Defendants is

10  liable jointly and severally with and to the same extent that the NWTW Defendants

11  are liable under Section 12(2) of the Securities Act to plaintiffs and the members of

12  the Class as a result of the wrongful conduct alleged herein.

### COUNT IV

### (Against All Defendants for Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)

16      139.  Plaintiffs repeat each allegation contained in the preceding paragraphs, as

17  if fully set forth herein. This Count is asserted against all defendants for violation of

18  Section 10(b) of the Exchange Act, 15 U.S.C. §78b, and Rule 10b-5 promulgated

19  thereunder, on behalf of Plaintiffs and all members of the Class who purchased any

20  Herbalife Securities and/or Herbalife/NWTW Securities on or after February 19,

21  1999.

22      140.  By engaging in the conduct alleged herein, by the making of false and

23  misleading statements, and by omitting to disclose the material facts identified above,

24  defendants employed devices and artifices, and engaged in a scheme and course of

25  business which was intended to and did act to induce plaintiffs and the members of

26  the Class to purchase Herbalife Securities and/or Herbalife/NWTW Securities during

27  the Class Period.

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

141.    During the Class Period, the defendants, individually and in concert, directly and indirectly, engaged and participated in a course of conduct, pursuant to which they knowingly or with deliberate recklessness engaged in acts, transactions, and courses of business which operated as a fraud and deceit upon plaintiffs and the other members of the Class, including the unlawful operation and promotion of a pyramid scheme.  Defendants knowingly, or with deliberate recklessness, made materially false statements, and failed to disclose the material facts necessary to make the statements made not misleading.  As a result, plaintiffs and the Class relied, to their detriment, on the express and implicit representations that defendants were engaged in the operation and promotion of a legitimate business opportunity and not a pyramid scheme and on the fraudulent omissions described herein.  Had plaintiffs and the other members of the Class known the truth, they would not have purchased the Herbalife Securities and/or Herbalife/NWTW Securities at any price.

142.    By reason of the foregoing, defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they (a) employed devices, schemes and artifices to defraud, to wit, a pyramid scheme; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon plaintiffs and the other members of the Class in connection with their purchases of Herbalife Securities and/or Herbalife/NWTW Securities during the Class Period.

## COUNT V

**(Against the Herbalife Defendants Pursuant to Section 20(a) of the Exchange Act for Violation of Section 10(b) of the Exchange Act)**

143.    Plaintiffs repeat each allegation contained in the preceding paragraphs, as if fully set forth herein. This Count is asserted against the Herbalife Defendants pursuant to Section 20(a) of the Exchange Act, for controlling person liability arising

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1   from violations Section 10(b) of the Exchange Act by the NWTW Defendants, on

2   behalf of Plaintiffs and all members of the Class who purchased any

3   Herbalife/NWTW Securities on or after February 19, 1999.

4          144.   At the time the NWTW promotional materials were disseminated by the

5   NWTW Defendants, the Herbalife Defendants were controlling persons of each of the

6   NWTW Defendants by reason of (a) the Herbalife Defendants' contractual control

7   and influence over each of the Individual Defendants pursuant to their Herbalife

8   distributor agreements; (b) the Herbalife Defendants' right to enforce the Herbalife

9   rules and regulations incorporated by reference in the Herbalife distributor

10  agreements, as demonstrated by Herbalife's suspension of individual defendants

11  Powell and Juneja shortly after the filing of this action; (c) the joint management of

12  the Herbalife network marketing system by Herbalife and the Individual Defendants

13  and other top level Herbalife distributors; and (d) the role of the NWTW Defendants

14  and their controlled corporations, Dream Builders and H.B. International Group, Inc.,

15  in executing Herbalife's corporate strategy to develop Lead Generation Systems like

16  NWTW.  Herbalife actively exercised its control over the business and affairs of the

17  Individual Defendants.

18         145.   None of the Herbalife Defendants made a reasonable investigation or

19  possessed reasonable grounds for belief that the statements described above, which

20  were contained in the NWTW promotional materials, were true, were without

21  omission of any material facts, and were not misleading.  Therefore, by reason of their

22  positions of control and influence over the NWTW Defendants, each of the Herbalife

23  Defendants is liable jointly and severally with and to the same extent that the NWTW

24  Defendants are liable under Section 10(b) of the Exchange Act to Plaintiffs and the

25  members of the Class as a result of the wrongful conduct alleged herein.

26

27

28

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

# COUNT VI

## (Fraud and Deceit Against All Defendants)

146.   Plaintiffs repeat each allegation contained in the preceding paragraphs, as if fully set forth herein. This Count is asserted against all defendants, on behalf of Plaintiffs and all members of the Class who purchased Herbalife/NWTW Securities.

147.   Each of the acts, practices, misrepresentations, omissions, violations, and other wrongs complained of above, have been engaged in by defendants with malice and with specific and deliberate intent to oppress, defraud and deceive plaintiffs and the Class.

148.   Defendants, and each of them, knew and know that they were engaged in the fraudulent conduct as aforesaid, and that said conduct constitutes a breach of their duties to the plaintiffs and the Class and a fraud.  In the alternative, said defendants and each of them, have engaged in the conduct as hereinbefore described which rendered and continues to render substantial assistance to, aided and abetted, and concealed the fraudulent NWTW scheme.

149.   With knowledge of the unlawful purpose thereof, said defendants, and each of them, have entered into an undisclosed agreement to accomplish an illegal pyramid scheme and in their actions have assisted that scheme and its injurious results.

150.   As a proximate result of the conduct of defendants and each of them, plaintiffs and the Class have invested time and money in their Herbalife distributorships and the NWTW promotional scheme in actual and justifiable reliance thereon, and plaintiffs and the Class have been injured as a proximate result thereof.

151.   As a result, and because defendants have acted and continue to act maliciously and oppressively, despicably, and in callous disregard of the rights and interests of plaintiffs, plaintiffs and the Class are not only entitled to the damages set forth above, but also to punitive damages, in a sum not presently known, for the sake of example and by way of punishing defendants.

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

**COUNT VII**

**(Endless Chain Scheme in Violation of California Penal Code §327 Against All Defendants)**

152.   Plaintiffs repeat each allegation contained in the preceding paragraphs, as if fully set forth herein. This Count is asserted against all defendants, on behalf of the Plaintiffs and all members of the Class.

153.   The Herbalife Plan and the combination of the Herbalife Plan and the NWTW System for the promotion of Herbalife distributorships constitute Endless Chain schemes within the meaning of California Penal Code §327.

154.   Plaintiffs and the Class are entitled to rescission of the NWTW and Herbalife contracts and return of all consideration paid pursuant to defendants' Endless Chain Scheme, less any compensation received, pursuant to California Civil Code §1689.2.

**COUNT VIII**

**(Violation of California Seller Assisted Marketing Plans Law Against All Defendants)**

155.   Plaintiffs repeat each allegation contained in the preceding paragraphs, as if fully set forth herein. This Count is asserted against all defendants, on behalf of the plaintiffs and all members of the Class who purchased Herbalife/NWTW Securities.

156.   The combination of the Herbalife Plan and the NWTW System is a Seller Assisted Marketing Plan is within the meaning of California Civil Code §1812.201(a) and is not within the scope of any of the exclusions set forth in California Civil Code §1812.201(b), in that:

a.   The NWTW System calls for Herbalife distributors to make a total initial payment exceeding $500 within six months after commencement of operations for products, equipment, supplies or services, including but not limited to the purchase of multiple copies of the "First Package" and "Second Package" for use in soliciting new distributors;

Page 59

1    b.    Defendants have advertised or solicited the purchase of the

2    Herbalife Plan and the NWTW System; and

3    c.    Defendants have represented that purchasers will earn, are likely to

4    earn and can earn an amount in excess of the initial payment.

5    157.   Defendants have sold, or represented that they have sold, five or more

6    hybrid Herbalife/NWTW distributorships within the 24 months preceding the

7    solicitations of plaintiffs and the Class, or have represented that they intend to sell

8    five or more hybrid Herbalife/NWTW distributorships within the 12 months

9    following the solicitations of plaintiffs and the Class.

10    158.   The sales or offers to sell hybrid Herbalife/NWTW distributorships

11    occurred within or originated from the State of California in that plaintiff Annette

12    Sanchez resides in the State of California, the Herbalife Defendants and defendant

13    H.B. International Group, Inc. have their principal places of business in California,

14    and the purchase of a hybrid Herbalife/NWTW distributorship necessarily involves

15    the execution of an Herbalife distributorship agreement.

16    159.   Defendants have violated the California Seller Assisted Marketing Plans

17    law, California Civil Code §1812.200, et seq., by:

18    a.    Making earnings claims concerning the Herbalife Plan and the

19    NWTW System without the substantiating data or disclosures required by California

20    Civil Code §1812.204(d); and

21    b.    Failing to provide prospective purchasers of the Herbalife Plan and

22    the NWTW System with the disclosure statement required by California Civil Code

23    §1812.205 or the information sheet required by California Civil Code §1812.206.

24    160.   Plaintiffs and members of the Class have been injured by Defendants'

25    violations of the California Seller Assisted Marketing Plans law and are therefore

26    entitled to actual damages, damages in the nature of rescission and punitive damages

27    pursuant to California Civil Code §1812.218.

28

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

# COUNT IX

## (Unlawful, Unfair or Deceptive Business Practices in Violation of California Business and Professions Code Section 17200 et seq. Against All Defendants)

161.   Plaintiffs repeat each allegation contained in the preceding paragraphs, as if fully set forth herein. This Count is asserted against all defendants, on behalf of the Plaintiffs, the Class, and the general public.

162.   By promoting and selling the Herbalife Plan and the NWTW System in connection with Herbalife distributorships as alleged herein, defendants have engaged in unlawful or deceptive business practices and unfair competition within the meaning of California Business and Professions Code §17200, including but not limited to:

a.   Making false or misleading statements in violation of California Business and Professions Code §17500; and

b.   Contriving, preparing, setting up, proposing or operating an endless chain in violation of California Penal Code §327.

163.   In addition, defendants engaged in a deceptive and/or unfair business practice, as well as unfair, deceptive, or untrue advertising and acts prohibited by Business & Professions Code §17500, et seq.  Specifically, defendants marketed the Herbalife Plan and the NWTW System as described above, by reason of material misstatements and omissions.

164.   The above-described unlawful, unfair and deceptive business practices conducted by defendants present a threat and likelihood of deception to members of the Class and the general public, in that defendants have systematically perpetrated and continue to perpetrate deceptive, unlawful and unfair acts upon members of the public by knowingly marketing the Herbalife Plan and the NWTW System deceptively as described above.

165.   Pursuant to Business & Professions Code §§17200 and 17203, plaintiffs, on behalf of themselves, members of the Class, and members of the general public, seek an order awarding plaintiffs and members of the Class restitution of all monies

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1  wrongfully acqu    by defendants by means of suc wrongful acts and practices, as

2  permitted under California law, so as to restore any and all monies to plaintiffs and

3  members of the Class which are still retained by defendants, plus interest, attorneys'

4  fees and costs pursuant to, inter alia, Code of Civil Procedure §1021.5.

5       166.   Defendants' unfair competition presents a continuing threat and

6  likelihood of causing further harm to plaintiffs and members of the Class, such that

7  injunctive relief would be appropriate, in the form of an order enjoining defendants

8  from selling, promoting or condoning the sale of the Herbalife Plan or the NWTW

9  System and promotional materials and ordering defendants to disgorge all money

10  received as a result of the Herbalife Plan or the NWTW scheme.

11

12

### PRAYER FOR RELIEF

13

14       WHEREFORE, plaintiffs request of this Court the following relief, on behalf of

15  plaintiffs and all others similarly situated:

16

17       A.     For an order certifying the proposed Class under Fed. R. Civ.

18  P.23(b)(1) and/or 23(b)(2) on a mandatory basis; under 23(b)(3) on a voluntary basis,

19  or, in the alternative, according to proof; and certifying any necessary or appropriate

20  subclasses under Fed. R. Civ. P. 23(c)(4)(B);

21       B.     For rescission of Class members' contracts with Herbalife and

22  NWTW and recovery of the consideration by them paid to defendants and other

23  amounts expended in connection therewith, plus interest thereon at the contract or

24  legal rate from the date of each said purchase;

25       C.     For compensatory damages for their economic losses, together

26  with interest thereon at the contract or legal rate, plus additional general and

27  incidental damages, according to proof;

28

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

1     D.   For exemplary and punitive damages for defendants' fraud, in an

2   amount commensurate with each defendant's ability to pay, which will be shown at

3   trial;

4     E.   For disgorgement by defendants, and restitution to plaintiffs and

5   the proposed Class, of all earnings, profits, compensation and benefits obtained by

6   defendants as a result of their deceptive business practices;

7     F.   For injunctive relief, as requested above, and the cessation of the

8   Herbalife Plan and the NWTW promotional scheme in violation of applicable federal

9   and state law;

10     G.   For costs incurred herein, including attorneys' fees to the extent

11   allowable by law; and

12     H.   For such other and further legal and equitable relief as this Court

13   may deem proper.

14

15   //

16   //

17   //

18

19

20

21

22

23

24

25

26

27

28

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

# DEMAND FOR JURY TRIAL

The Plaintiffs demand a trial by jury as to all issues so triable.

DATED: May 1, 2003

SCHUBERT & REED LLP

By: _____

Aaron H. Darsky

ROBERT C. SCHUBERT S.B.N. 62684
JUDEN JUSTICE REED S.B.N. 153748
AARON H. DARSKY S.B.N. 212229
SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, California  94111
Telephone: (415) 788-4220

DOUGLAS M. BROOKS
EDWARD L. MANCHUR
GILMAN & PASTOR, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA 01906
Telephone: (781) 231-7850

Attorneys for Individual and
Representative Plaintiffs Nancy Jacobs
and Annette M. Sanchez

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

## CERTIFICATION OF PLAINTIFF NANCY JACOBS
## PURSUANT TO FEDERAL SECURITIES LAWS

NANCY JACOBS ("Plaintiff") declares, as to the claims asserted under the federal securities laws that:

1.    Plaintiff has reviewed the Plaintiffs' Second Amended Complaint and authorized its filing.

2.    Plaintiff did not purchase the securities that are the subject of this action at the direction of Plaintiffs' counsel or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's purchases of the securities that are the subject of this action during the Class Period are as follows: [see attached schedule].

5.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve as a representative party for a class in any actions filed under the securities laws.

6.    During the three years prior to the date of filing of the original complaint in this action, Plaintiff has not sought to serve as a representative party for a class in any actions filed under the securities laws.

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of April, 2003 at _____.

By: _Nancy Jacobs_
                NANCY JACOBS

*A*

## SCHEDULE TO PARAGRAPH 4 OF CERTIFICATION OF PLAINTIFF
## NANCY JACOBS PURSUANT TO FEDERAL SECURITIES LAWS

| **Date** | **Purchased** |
|----------|---------------|
| 8/27/01 | $45.00 |
| 8/30/01 | $299.00 |
| 9/4/01 | $2,903.00 |
| 9/4/01 | $684.46 |
| 9/28/01 | $999.00 |
| 10/4/01 | $394.39 |
| 10/4/01 | $33.90 |
| 10/10/01 | $459.00 |
| 10/22/01 | $30.00 |
| 10/25/01 | $480.00 |
| 10/25/01 | $126.99 |
| 10/29/01 | $131.18 |
| 11/2/01 | $267.28 |
| 11/2/01 | $622.64 |
| 11/5/01 | $287.86 |
| 11/6/01 | $370.00 |

S:/SchedulePara4Jacobs

| **Date** | **Purchased** |
|----------|---------------|
| 11/6/01 | $60.95 |
| 11/6/01 | $425.99 |
| 11/16/01 | $238.47 |
| 11/20/01 | $480.00 |
| 12/4/01 | $287.86 |
| 12/15/01 | $71.85 |
| | $9,699.55 |



## CERTIFICATION OF PLAINTIFF ANNETTE M. SANCHEZ
## PURSUANT TO FEDERAL SECURITIES LAWS

ANNETTE M. SANCHEZ ("Plaintiff") declares, as to the claims asserted under the federal securities laws that:

1.     Plaintiff has reviewed the Plaintiffs' Second Amended Complaint and authorized its filing.

2.     Plaintiff did not purchase the securities that are the subject of this action at the direction of Plaintiffs' counsel or in order to participate in any private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff's purchases of the securities that are the subject of this action during the Class Period include at least the following: [see attached schedule]

5.     During the three years prior to the date of this Certification, Plaintiff has not sought to serve as a representative party for a class in any actions filed under the securities laws.

6.     During the three years prior to the date of filing of the original complaint in this action, Plaintiff has not sought to serve as a representative party for a class in any actions filed under the securities laws.

7.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this day of April, 2003 at _ROSEVILLE, CA_

By: _Annette M. Sanchez_  4.22.03

ANNETTE M. SANCHEZ

S:\NWTW\Cert\PltfSanchez

_B_

## SCHEDULE FOR PARAGRAPH 4 OF CERTIFICATION FOR PLAINTIFF ANNETTE M. SANCHEZ PURSUANT TO FEDERAL SECURITIES LAWS

| **Date** | **Purchased** |
|----------|---------------|
| 4/5/00 | $104.05 |
| 4/6/00 | $1,436.25 |
| 4/14/00 | $432.97 |
| 4/20/00 | $42.39 |
| 4/20/00 | $1,999.99 |
| 4/21/00 | $1,323.48 |
| 4/21/00 | $295.53 |
| 4/26/00 | $172.80 |
| 5/5/00 | $24.28 |
| 5/25/00 | $201.28 |
| 6/20/00 | $34.14 |
| 6/26/00 | $56.55 |
| 7/14/00 | $73.27 |
| 7/17/00 | $330.42 |
| 7/19/00 | $30.00 |
| 7/26/00 | $133.45 |
| 8/9/00 | $94.34 |
| 8/18/00 | $60.00 |
| 8/21/00 | $144.97 |

Page 2

| Date | Purchased |
|------|-----------|
| 8/25/00 | $330.42 |
| 9/1/00 | $132.23 |
| 9/1/00 | $54.40 |
| 9/19/00 | $30.00 |
| 9/21/00 | $463.68 |
| 10/3/00 | $32.03 |
| 10/3/00 | $35.64 |
| 10/5/00 | $64.83 |
| 10/5/00 | $340.25 |
| 10/6/00 | $39.90 |
| 10/26/00 | $219.12 |
| 11/3/00 | $48.79 |
| 11/9/00 | $84.06 |
| 11/15/00 | $114.35 |
| 11/16/00 | $30.00 |
| 11/17/00 | $47.39 |
| 11/17/00 | $99.92 |
| 11/17/00 | $30.00 |
| 12/1/00 | $66.56 |
| 12/11/00 | $134.32 |

S:/NWTW/SchedulePara4Sanchez

| Date | Purchased |
|------|-----------|
| 12/11/00 | $1.97 |
| 1/2/01 | $383.08 |
| 1/10/01 | $84.29 |
| 1/10/01 | $150.01 |
| 1/18/01 | $30.00 |
| 1/19/01 | $20.00 |
| 1/31/01 | $29.48 |
| 2/7/01 | $173.69 |
| 2/7/01 | $186.40 |
| 2/8/01 | $155.83 |
| 2/12/01 | $29.21 |
| 2/13/01 | $150.66 |
| 2/13/01 | $133.83 |
| 2/14/01 | $356.00 |
| 2/21/01 | $30.00 |
| 2/23/01 | $117.84 |
| 2/26/01 | $18.90 |
| 2/27/01 | $68.39 |
| 2/27/01 | $59.87 |
| 2/28/01 | $185.09 |

Page 4

| | |
|---|---|
| 3/8/01 | $138.10 |
| 3/8/01 | $199.00 |
| 3/8/01 | $30.00 |
| 3/19/01 | $272.64 |
| 3/19/01 | $124.53 |
| 3/21/01 | $126.33 |
| 3/21/01 | $117.84 |
| 3/23/01 | $110.76 |
| 3/23/01 | $91.38 |
| 3/26/01 | $110.76 |
| 3/26/01 | $61.18 |
| 4/3/01 | $87.96 |
| 4/11/01 | $289.10 |
| 4/11/01 | $289.10 |
| 4/19/01 | $16.98 |
| 4/19/01 | $35.58 |
| 4/23/01 | $59.95 |
| 4/25/01 | $786.91 |
| 4/25/01 | $999.00 |
| 4/25/01 | $41.48 |
| 4/25/01 | $35.00 |

| **Date** | **Purchased** |
|----------|---------------|
| 4/26/01 | $299.00 |
| 4/26/01 | $433.65 |
| 4/26/01 | $452.70 |
| 5/1/01 | $1,081.41 |
| 5/2/01 | $50.00 |
| 5/7/01 | $422.65 |
| 5/10/01 | $134.81 |
| 5/11/01 | $805.96 |
| 5/11/01 | $11.00 |
| 5/14/01 | $146.84 |
| 5/17/01 | $134.81 |
| 5/17/01 | $134.81 |
| 5/21/01 | $351.23 |
| 5/21/01 | $10.00 |
| 5/21/01 | $157.37 |
| 5/23/01 | $79.67 |
| 5/25/01 | $157.32 |
| 5/29/01 | $314.62 |
| 5/30/01 | $157.32 |

Page 6

| **Date** | **Purchased** |
|---|---|
| 5/30/01 | $100.38 |
| 6/8/01 | $60.00 |
| 6/12/01 | $59.45 |
| 6/13/01 | $64.69 |
| 6/14/01 | $160.00 |
| 6/14/01 | $417.15 |
| 6/18/01 | $433.65 |
| 6/21/01 | $75.00 |
| 6/21/01 | $452.70 |
| 6/25/01 | $166.33 |
| 7/3/01 | $134.81 |
| 7/3/01 | $101.71 |
| 7/5/01 | $159.65 |
| 7/11/01 | $314.62 |
| 7/18/01 | $40.00 |
| 7/24/01 | $213.13 |
| 7/27/01 | $61.18 |
| 7/31/01 | $146.07 |
| 8/6/01 | $190.51 |

Page 7

| Date | Purchased |
|------|-----------|
| 8/16/01 | $134.81 |
| | $24,597.18 |

1        <u>PROOF OF SERVICE BY MAIL</u>

2

3     I, the undersigned, state that I am employed in the City and County of San

4 Francisco, State of California; that I am over the age of eighteen (18) years and not a

5 party to the within action; that I am employed at Schubert & Reed LLP, Two

6 Embarcadero Center, Suite 1660, San Francisco, California 94111; that on the date set

7 out below, I served a true copy of the attached

8        **PLAINTIFFS' SECOND AMENDED COMPLAINT**

9 on the person(s) listed below, by placing said copy enclosed in a sealed envelope with

10 postage thereon fully prepaid, in the United States mailbox at San Francisco,

11 California, addressed as follows:

12         ***\*\*See Attached\*\****

13     I declare under the penalty of perjury that the foregoing is true and correct.

14 Executed this 1st day of April, 2003 in San Francisco, California.

15

16

17

18                _____

19                  Chris Schmidt

20

21

22

23

24

25

26

27

28

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

PROOF OF SERVICE
Case No. CV-02-01431 SJO (RCx)

Service List

Herbalife/The Newest Way To Wealth Litigation

Case No. 02-01431-SJO (RCx)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Doug Brooks, Esq.
Edward L. Manchur, Esq.
Gilman and Pastor, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA  01906

**Plaintiffs' Counsel**

A. Kristine Floyd, Esq.
Allen Matkins Leck Gamble & Mallory
1900 Main Street
5th Floor
Irvine, CA  92614

David H. Getz, Esq.
Todd Eastman, Esq.
Arter & Hadden LLP
550 West C. Street
16th Floor
San Diego, CA  92101

Alan H. Boon, Esq.
Berger, Kahn, Shafton, Moss, Figler,
Simon & Gladstone
Post Office Box 19694
Irvine, CA  92623

Linda Northrup, Esq.
Law Offices of Linda L. Northrup, P.C.
12400 Wilshire Boulevard
Suite 400
Los Angeles, CA  90025

Melvin R. Goldman, Esq.
Morrison & Foerster LLP
425 Market Street
San Francisco, CA  94105

Mark R. Bateman, Esq.
Morrison & Foerster LLP
555 West Fifth Street
Suite 3500
Los Angeles, CA  90013

Kevin D. Quigley, Esq.
Quarles & Brady Streich Lang LLP
One Renaissance Square
Two North Central Avenue
Phoenix, AZ  85004

Scott D. Freeman, Esq.
Adam Fox, Esq.
Squire, Sanders & Dempsey LLP
40 North Central Avenue
Suite 2700
Phoenix, AZ  85004

Brian A. Kumamoto, Esq.
Squire, Sanders & Dempsey LLP
801 South Figueroa
14th Floor
Los Angeles, CA  90017

Adam J. Soibelman, Esq.
Stone Rosenblatt & Cha
16633 Ventura Boulevard
Suite 1401
Encino, CA  91436

Robert H. Rogers, Esq.
Sullivan, Workman & Dee
800 Figueroa Street
Twelfth Floor
Los Angeles, CA  90017

**Counsel for Defendants**

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

PROOF OF SERVICE
Case No. CV-02-01431 SJO (RCx)